**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 95-30860

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES M. LEWIS;
DEBRA FAYE LEWIS,

Defendants-Appellants.

---

Appeal from the United States District Court
for the Western District of Louisiana

---

August 19, 1996

Before JOLLY, DUHÉ, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

James M. Lewis and Debra Faye Lewis appeal their convictions for first degree murder under Louisiana law pursuant to the Assimilative Crimes Act. Because the federal murder statute and sentencing guidelines occupy the area of the law, they contend that the district court erred in refusing to dismiss their indictments. They also challenge the sufficiency of the evidence as well as evidentiary rulings made by the district court. Additionally, Debra Lewis argues that Battered Women's Syndrome diminished her capacity to form a specific intent to kill or inflict great bodily harm or to aid and abet James Lewis. For the following reasons, we reverse the district court's ruling regarding the indictments but affirm the defendants' convictions and sentences.

## FACTS

James Lewis and his wife, Debra Lewis, were arrested for the beating death of four-year-old Jadasha D. Lowery, the biological daughter of James Lewis and Stacy Lowery. The death occurred on the military reservation at Fort Polk in Vernon Parish, Louisiana, where Mr. Lewis was stationed with the United States Army.[1]

On the day of her death, Jadasha was subjected to severe beatings, which resulted in several contusions and bruises on her scalp and which caused massive bruising over her entire body. The body bruises caused hemorrhages beneath the skin that redirected one-third to two-thirds of her entire blood volume from her circulatory system and into the tissues surrounding the injuries. The head injuries caused Jadasha to suffer cerebral edema,[2] which was identified as the cause of her death. The indictment charged the Lewises with first degree murder under Louisiana law through the Assimilative Crimes Act.[3] After receiving guilty verdicts, both Lewises were sentenced to life imprisonment. The Lewises appealed.

## DISCUSSION

A.     **ASSIMILATIVE CRIMES ACT.**

---

[1]Fort Polk, a United States military reservation, is a federal enclave as defined in 18 U.S.C. § 7.

[2]Cerebral edema is a condition in which the brain swells and presses on the brain stem and which eventually causes respiratory function to cease.

[3]The indictment provides as follows:

> That on or about the 20th day of December, 1993, at Fort Polk, Louisiana, in the Western District of Louisiana, upon lands acquired for the use of the United States and under the exclusive jurisdiction thereof, JAMES M. LEWIS and DEBRA FAYE LEWIS, defendants herein, each knowingly and willfully aided and abetted, one by the other, did, with specific intent to inflict great bodily harm, commit first degree murder of Jadasha D. Lowery, a human being under the age of twelve years, in violation of Title 14 Louisiana Revised Statutes Annotated, Section 30(5), [Amended March 6, 1996 to 30(A(5)], all in violation of Title 18, United States Code, Sections 7, 13, and 2. {18 U.S.C. §§ 7, 13, & 2; La. R.S. 14:30(5)}.

2

The Lewises argue that the indictment under which they were charged is defective because it improperly charges them under La. Rev. Stat. 14:30A(5) when 18 U.S.C. § 1111 criminalizes the same conduct. Mr. Lewis asserts that first degree murder of a person under the age of twelve under the Louisiana statute is comparable to second degree murder under section 1111, with the minor age of the victim causing punishment to be enhanced under the sentencing guidelines. Mrs. Lewis contends that the government was statute "shopping" when it charged them under Louisiana law in order to obtain a lesser standard of proof and the benefit of more severe penalties in the event the jury returned verdicts on lesser included offenses.

Our examination of the Lewises' indictment requires us to analyze the Assimilative Crimes Act. Interpretations of statutes receive de novo review. Estate of Moore v. C.I.R., 53 F.3d 712, 714 (5th Cir. 1995). Similarly, review of a district court's conclusion that an indictment is sufficient is reviewed under the de novo standard. United States v. Green, 964 F.2d 365, 372 (5th Cir. 1992), cert. denied, 506 U.S. 1055 (1993). After evaluating the language of the ACA, Supreme Court precedent, and other federal jurisprudence, we are compelled to conclude that the Lewises' indictment is invalid.

The ACA makes punishable crimes occurring on federal enclaves although Congress has not expressly addressed the conduct in the federal statutes. The ACA provides:

> Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State . . . in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to like punishment.

18 U.S.C. § 13. Through the ACA the government may use state statutes to prosecute offenders on federal enclaves "only if no act of Congress directly makes the offender's conduct punishable." United States v. Brown, 608 F.2d 551, 553 (5th Cir. 1986). The ACA fills in gaps existing in federal statutes regarding criminal law. Id. However, where Congress has enacted legislation criminalizing conduct on the enclaves, the federal statutes preempt the state laws regarding those crimes. United States v. Sharpnack, 355 U.S. 286, 291 (1958).

3

The Supreme Court shed light on the limitations of the ACA in Williams v. United States, 327 U.S. 711 (1946). In Williams, the Court reversed the conviction of a white married man convicted under the Arizona statutory rape law pursuant to the ACA for having sex with a seventeen-year-old Indian girl on an Indian reservation. 327 U.S. at 725. The federal statutes punished carnal knowledge of a minor girl when the victim was under the age of sixteen, whereas the Arizona statute punished the same conduct when the victim was under the age of eighteen. The Arizona statute provided a harsher penalty than the federal statute. Id. at 717. Interpreting the language existing in the ACA at the time, the Court concluded that the precise acts of the defendant were made criminal under federal statutes addressing adultery or fornication as well as carnal knowledge, and the government could not enlarge the definition of the federal carnal knowledge crime by incorporating the state statutory rape statute through the ACA. Id. at 717-18. The Court further noted that the ACA "has a natural place to fill through its supplementation of the Federal Criminal Code, without giving it the added effect of modifying or repealing existing provisions of the Federal Code." Id. at 718. The language of the ACA referred "in a generic sense" to "acts of a general type or kind." Id. at 722. The Court held that in Williams' case "not only has the generic act been co vered by the [federal] definition of having carnal knowledge, but the specific acts have been made 'penal' by the [federal] definition of adultery." Id. at 723.

This court, like the majority of the other circuits,[4] has interpreted Williams as establishing a "precise acts" test regarding the applicability of the ACA. See United States v. Brown, 608 F.2d 551, 554 (5th Cir. 1979). In Brown, the court held that the government could prosecute the defendant

---

[4]The circuit split following Williams is well recognized. See, e.g., United States v. Broadnax, 688 F. Supp. 1080, 1081-82 (E.D. Va. 1988); and United States v. Smith, 614 F. Supp. 454, 460 (D. Me. 1985), vacated in part on other grounds, United States v. Mariea, 795 F.2d 1094 (1st Cir. 1986). The majority view holds that the ACA does not apply when the "precise act" prohibited by the state statute is defined and prohibited by the federal statute. See generally, United States v. Johnson, 967 F.2d 1431 (10th Cir. 1992), cert. denied, 506 U.S. 1082 (1993); United States v. Sasnett, 925 F.2d 392 (11th Cir. 1991); United States v. Griffith, 864 F.2d 421 (6th Cir. 1988), cert. denied, 490 U.S. 1111 (1989); United States v. Kaufman, 862 F.2d 236 (9th Cir. 1988); and Fields v. United States, 438 F.2d 205 (2d Cir.), cert. denied, 403 U.S. 907 (1971). Compare the minority view holding that the ACA does not apply when the federal statute punishes the "generic conduct" covered in the statute. United States v. Butler, 541 F.2d 730 (8th Cir. 1976).

under the Texas child abuse statute even though injury to a child could be punishable under the federal assault statute because the precise act of injury to a child was not proscribed by federal law and the state statute was designed to punish specific conduct of a different character than the conduct proscribed by the federal assault statute. Mrs. Brown was charged with injuring her husband's biological two-year-old son, whom she struck on the head with a blunt, flat instrument. Though surgery revealed a subdural hematoma covering the left side of his brain, the child survived. The court in Brown rejected arguments that use of the child abuse statute enlarged the scope of the federal offense. It found the child abuse and assault statutes different because of the nature of the offense being punished. The court relied on the Second Circuit case, Fields v. United States, 438 F.2d 205 (2d Cir. 1971), to demonstrate that child abuse is a different type of assault than the conduct covered under the federal assault statute.

Similarly, in United States v. Fesler, 781 F.2d 384, 391 (5th Cir. 1986), the court clarified that the federal statute and the state statute must involve different elements and must seek to punish different conduct. In Fesler, the Feslers were charged with murder under the federal statute and causing serious bodily injury under the Texas child abuse statute for the scalding death of their ten-month-old daughter whom they deliberately dipped in scalding water. The defendants alleged that the indictment violated the ACA. The court held that because the statutes covered different "precise acts," no violation had occurred. Id. at 391 The court noted that death of a human being, essential for the manslaughter conviction, was unnecessary for the child abuse conviction. The court further explained that "[i]t is important that the state statute seeks to punish a particular offense at which the federal statute is not aimed, child abuse." Id. Accordingly, the court upheld application of the ACA in this context.

This court consistently has found that child abuse constitutes a different "precise act" which the government may charge in addition to murder under the federal statute. See United States v. Webb, 796 F.2d 60, 62 (5th Cir. 1986), cert. denied, 479 U.S. 1038 (1987) (convicted of second degree murder under the federal statute and injury to a child under the state statute for the death of

5

a six-year-old boy whose head was slammed against a wall and who was scalded). Federal jurisprudence demonstrates that the different nature of the "act" regarding child abuse does not eliminate the need for seeking punishment for murder under the federal statute when the abuse results in death. See United States v. Phillip, 948 F.2d 241, 245 (6th Cir. 1991), cert. denied, 504 U.S. 930 (1992) (the defendant was charged with second degree murder under the federal statute and committing and permitting child abuse under the Kentucky child abuse statute); and United States v. Harris, 661 F.2d 138, 139 (10th Cir. 1981) (the defendant was charged with murder under the federal statute and the Wyoming child abuse statute). Indeed, where conviction under the state statute was allowed, the state child abuse statute was alleged in addition to murder under the federal statute, rather than in place of it.

Herein lies the distinction between the present case and Brown and Fesler. The government in the present case has entirely usurped the federal murder statute rather than supplemented the statute with "gap-filling" state law. The government uses the precise acts test as reasoned in Brown and Fesler to argue that it may use the state murder statute although the federal statute already punishes murder. We find that the precise acts test cannot save this indictment.

The "precise act" sought to be punished under 18 U.S.C. § 1111 and La. Rev. Stat. § 14:30A(5) for murder of a victim under twelve[5] is the intentional killing of a human being (i.e., "murder"). This is the conduct clearly identified in both statutes. Murder is punishable under both the state and federal statutes though they define and punish the conduct differently. Section 1111 provides the following definition of murder: "Murder is the unlawful killing of a human being with malice aforethought." The section then delineates the elements needed for first degree murder and second degree murder:

> Every murder perpetrated by [1] poison, [2] lying in wait, or [3] any other kind of willful, deliberate, malicious, and premeditated killing; or [4] committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or [5]

---

[5]Hereinafter we refer to the crime of "murder of a victim under twelve" as "murder of a child" or "child murder."

6

perpetrated from premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

Section 14:30A(5)of the Louisiana Revised Statutes in pertinent part provides:

A.  First degree murder is the killing of a human being:

. . . .

(5) When the offender has specific intent to kill or to inflict great bodily harm upon a victim under the age of twelve or sixty-five years of age or older.

The varying definitions affect the degree of the crime and the level of punishment.  "Murder of a child" does not constitute a different act of murder omitted from the federal murder statute.  That Louisiana chose to define first degree murder regarding children differently than Congress defines it does not automatically make murdering a child a different or even a more specific act.

The government attempts to show that the state's concern for child abuse prompted the specific reference to "victims under the age of twelve" in the first degree murder statute.  We conclude that the government exaggerates the significance of the inclusion of the child murder provision in the Louisiana statute in order to piggyback the child abuse reasoning set forth in Brown and Fesler.  The Louisiana legislature placed child murder in the first degree murder statute to deter crimes against these vulnerable members of society and to ensure that if a child is murdered the offender is guaranteed to receive a certain sentence.[6]  This reasoning explains the placement of all acts listed in the Louisiana first degree murder provision as well as the reasoning underlying the enumerated crimes qualifying for first degree murder under the federal statute.  The lists in both statutes define what raises a particular homicide to the grade of first degree murder under the respective systems.  We reject the position taken by the government during oral argument that it used

---

[6]Though not reflected in the murder statute, Congress addresses the vulnerability concern in the sentencing guidelines.  Section 3A1.1 of the Federal Sentencing guidelines allows a judge to increase a defendant's sentence by two levels when the victim was a child.  Section 3A1.1 provides: "If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age . . . or that the victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels."

the Louisiana statute to "further define" the federal law. Further defining would create a more expansive definition of federal murder. Accordingly, to treat the murder of a child as conduct of a different nature would impermissibly enlarge the scope of the federal statute, which the Supreme Court in Williams instructed that we cannot do. We cannot permit the government to create the illusion of a "gap" in the law where none exists in order to enhance its ability to convict or to exact a harsher penalty.

Further, contrary to the government's suggestion, public concern regarding child abuse does not change the character of murder when a child is involved. The distinction we have recognized between assault under the federal statute and child abuse cannot transfer by analogy to create a tangible distinction between murdering an adult and murdering a child. Child abuse qualifies as a separate class of conduct because the nature of the crime spawns methods and treatments not needed in a general assault case. This is not necessarily true regarding the murder of a child. Children are murdered in many ways unrelated to child abuse. For example, if a child is shot during a robbery on a federal enclave, this conduct constitutes murder plain and simple, and this offense would not be different in nature so as to warrant invocation of the ACA. It would be illogical to say that child murders resulting from child abuse can be charged under the state statute pursuant to the ACA whereas all other child murders must be prosecuted under the federal statute. We find that the murder of a child is not a different degree of homicide that removes it from the federal murder statute.[7]

The government's interpretation of Brown and the precise acts test goes too far. Its interpretation would allow the wholesale incorporation of state law via the ACA. Neither Congress nor the Supreme Court intended such a result. For ACA purposes, a precise act cannot qualify as a "specific conduct of a different character" when the conduct is covered by a federal statute and when

---

[7]Our decision might be different if the government were prosecuting the Lewises under a Louisiana murder statute that expressly made criminal child murders resulting from child abuse. This would make the precise act criminalized under the state statute qualify as being conduct of a different nature or character.

8

the acts described in the federal and state statutes differ only in name, definition, or punishment.[8] The essential nature or theory of an act made criminal by a state statute must differ substantially from the federal statute in order to elevate the conduct to a precise act.

For example, "driving under the influence manslaughter" is conduct substantially different in nature than general "manslaughter." See United States v. Sasnett, 925 F.2d 392 (11th Cir. 1991). The theory underlying DUI manslaughter is to remove the need to prove that the drinking caused an accident. Id. at 396. The government need only prove that the defendant had a blood alcohol level of .10 or higher. The court in Sasnett allowed application of the ACA because no federal statute defined or prohibited this precise act. See also, United States v. Jones, 244 F. Supp. 181, 183 (S.D.N.Y. 1965) (allowing application of the ACA to prosecute using the "different theory" of disorderly conduct under the state statute rather than the federal parading/picketing statute where the defendants chained themselves to the court entrances to prevent entry or exit).

Murder of a child as defined under the Louisiana first degree murder statute cannot clear the "substantially different" hurdle. See Shirley v. United States, 554 F.2d 767, 768-69 (6th Cir. 1977) (ACA inapplicable though armed robbery under the state statute was more specific and more harshly punished than the federal robbery statute); and United States v. Big Crow, 523 F.2d 955, 958 (8th Cir. 1975), cert. denied, 424 U.S. 920 (1976) (ACA inapplicable though the state statute prohibited assault resulting in great bodily harm and provided a stiffer penalty than the federal assault statute).

---

[8]We note in passing that the Sixth Circuit persuasively has identified four categories of cases that arise under ACA cases: (1) all crimes criminal under the federal law are also criminal under state law, but additional conduct is criminal under state law, (2) federal law encompasses a broader area than the state law, but the state law carries harsher penalties or an easier burden of proof, (3) state and federal laws overlap to a degree, but each occupies an area of law not covered by the other, and the conduct at issue falls within the overlapped area, and (4) the laws overlap, as described in the third group; however, the conduct falls within the area in which the act is criminal under the state law but not the federal law. See United States v. Griffith, 864 F.2d 421, 423-24 (6th Cir. 1988). The district court in the present case found that this case falls within the third category because murder of a child could be punishable as federal murder, but the Louisiana statute presents a theory essentially different from that federal statute by taking into account the compelling state interest in protecting children under the age of twelve. We disagree. We find that this case falls within the second category. The Lewises' precise conduct is prohibited by the federal statute, but the penalty is harsher under the Louisiana statute. Murder of a child carries an automatic penalty of life or death in Louisiana. As explained above, the theories underlying the two statutes are not different.

Accordingly, we hold that the federal murder statute preempts the Louisiana first degree murder statute because the precise act here, killing a human being, is punishable under the federal statute and because the nature of the crime "murder of a child" does not differ substantially from the nature and theory of murder in general. The government improperly invoked the ACA to charge the Lewises under the Louisiana statute. The indictment contains an infirmity in that it references La. Rev. Stat. § 14:30A(5). We must determine whether the convictions and sentences can survive in spite of this infirmity.

## B.    REMEDY REGARDING FLAWED ASSIMILATION.

The infirmity discussed above is not fatal to the indictment in this case. We find the infirmity to be an apparent rather than a real defect. Accordingly, though we find error in the indictment, we will uphold the Lewises' convictions unless they establish reversible error on another ground. This court has previously adopted the maxim that "[w]here the government wrongfully secures a conviction under a state statute pursuant to the Assimilative Crimes Act, rather than under the relevant federal statute, the appropriate remedy is not reversal of the conviction, but rather a vacating of the sentence and a remand to the district court  for resentencing[,]" provided that the basic elements of the crime as defined in the federal statute were proven at trial and provided that no trial errors warrant reversal of the convictions. See United States v. Olvera, 488 F.2d 607, 608 (5th Cir. 1973), cert. denied, 416 U.S. 917 (1974) (citing United States v. Chaussee, 536 F.2d 637, 644 (7th Cir. 1976) (citing United States v. Word, 519 F.2d 612, 618 (8th Cir. 1975)). Compare United States v. Butler, 541 F.2d 730, 737 (8th Cir. 1976) (the court discussed the applicable remedy of remanding for sentencing, but instead vacated the convictions because the government did not prove at trial the interstate commerce nexus, which was not an element of the state crime).[9]

In Olvera, the government conceded on appeal that the federal statute was controlling rather than the ACA and the Texas statute. 488 F.2d at 608. This court held that the "sentence must be

---

[9]When discussing the conclusions reached in Chaussee, the district court below acknowledged the quote regarding remand. United States v. Lewis, 848 F. Supp. 692, 695 n.3 (W.D. La. 1995).

vacated and the cause remanded for entry of a new judgment imposing sentence under the federal statute." The Ninth Circuit took a similar position in Hockenberry v. United States, 422 F.2d 171, 174 (9th Cir. 1970). In Hockenberry, although the government conceded that the existence of an applicable act of Congress precluded assimilation of the California statute through the ACA, the court refused to dismiss the indictment. The indictment stated a crime against the United States even though the language of the California statute differed from the applicable federal statute. 422 F.2d at 173-74. The court reasoned that rules 7(c) and 52(a) of the Federal Rules of Criminal Procedure instruct that

> "error in the citation of the statute or its omission shall not be ground for dismissal of the indictment * * * or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice" and . . . "any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

Id. at 174 (internal brackets omitted). After noting that the defendant did not allege prejudice or defects affecting substantial rights and then finding that the record would not support either claim, the court rejected the argument that the court lacked jurisdiction to prosecute the defendant. The Hockenberry court affirmed the defendant's conviction but remanded the case for resentencing.[10]

Likewise, we find that remand for reindictment and retrial is not required under the circumstances of this case. The basic elements are the same for second degree murder under 18 U.S.C. § 1111(a) and first degree murder under La. Rev. Stat. § 14:30A(5). Both statutes require proof of specific intent[11] and the killing of a human being. Regarding intent, 18 U.S.C. § 1111

---

[10]"It is well settled [in the ACA context] that an incorrect statutory reference in an indictment does not require reversal where all of the essential elements of the correct statute are otherwise covered, but that any sentence imposed in excess of that allowed under the correct statute must be vacated and the case remanded for resentencing." United States v. Walker, 557 F.2d 741, 746-47 (10th Cir. 1977). Several circuits that have wrestled with defective indictments containing erroneously assimilated state law have reached the same conclusion. See , e.g., United States v. Hall, 979 F.2d 320, 323 (3d Cir. 1992); United States v. Lavender, 602 F.2d 639, 640-41 (4th Cir. 1979); United States v. Chaussee, 536 F.2d 637, 644-45 (7th Cir. 1976); United States v. Word, 519 F.2d 612, 618-19 (8th Cir.), cert. denied, 423 U.S. 934 (1975); United States v. Patmore, 475 F.2d 752, 753 (10th Cir. 1973); Dunaway v. United States, 170 F.2d 11, 12-13 (10th Cir. 1948).

[11]We reject Mrs. Lewis's arguments that the federal murder statute requires proof of "intent to kill." She says that because she and her husband never intended to kill Jadasha they could not be convicted of murder under the federal statute. This circuit has indicated that malice aforethought may

requires proof of "specific intent to inflict serious bodily injury," and La. Rev. Stat. § 14:30A(5) requires proof of "specific intent to inflict great bodily harm." The dissimilar phrasing does not destroy the compatibility existing between the statutes. This court has already acknowledged that the intent element under the federal murder statute is comparable to the intent required under the Louisiana murder statutes. See United States v. Tolliver, 61 F.3d 1189, 1221 (5th Cir. 1995), vacated on other grounds, Sterling v. United States, 116 S. Ct. 900 (1996). In Tolliver, when analyzing a sentencing issue, the court agreed with the district court that the Louisiana second degree statute, under which the defendants were convicted, was most akin to the federal crime of first degree murder.

> [T]he language of the guidelines instructs the court to compare the conduct, not the titles of the statutes cited. As pointed out by the district court, different states have different labels for the same crime,
>
> > [t]herefore, depending upon which state murder statute is charged as the underlying offense of "premeditated murder or killing with specific intent," inconsistent sentences for identical illegal conduct would be imposed in different states if the base offense level was computed merely by looking at the "label" of such statute and having that label be determinative of the most analogous federal offense, rather than looking at the actual substance of the underlying state statute to determine the most analogous federal offense.

The Tolliver court concluded that the district court had correctly compared the substance of the underlying offense and correctly found that first degree murder was the most analogous federal offense. Though labeled somewhat differently, "intent to inflict serious bodily injury" and "intent to inflict great bodily harm" represent parallel intents for purposes of evaluating these murder statutes.

---

be inferred from circumstances which show a callous, wanton, or extremely indifferent disregard for human life. United States v. Chagra, 807 F.2d 398, 402 (5th Cir. 1986), cert. denied, 484 U.S. 832 (1987) (after rejecting the defendant's argument that the jury instruction, which did not demand proof of an intent to kill but only demanded proof of reckless acts causing the death of another, was error, the court noted that the instruction reflected the correct definition of malice); see also, Unites States v. Harrelson, 766 F.2d 186, 189 n.5 (5th Cir.), cert. denied, 474 U.S. 908 (1985); and United States v. McRae, 593 F.2d 700, 703 (5th Cir.), cert. denied, 444 U.S. 862 (1979). More importantly, this court has specifically found that malice aforethought is equivalent to an intent do serious bodily injury. Lara v. Parole Comm'n, 990 F.2d 839, 841 (5th Cir. 1993) (explaining the three distinct mental states encompassed in malice aforethought: "(1) intent to kill; (2) *intent to do serious bodily injury*; and (3) extreme recklessness and wanton disregard for human life" [emphasis added]).

12

Accordingly, the elements under the federal and Louisiana murder statutes are analogous enough for us to conclude that the two statutes share the same essential elements.

In the present case, the government proved the elements for federal murder at trial. The district judge instructed the jury as follows:

in order to convict either of the defendants of First Degree Murder, you must find:

1. That said defendant killed Jadasha D. Lowery on or about December 20, 1993; and

2. That said defendant acted with specific intent to kill or inflict great bodily harm. . . .

The jury's finding that both Lewises were guilty of this crime indicates that the intent and death elements were satisfied. Accordingly, the elements for second degree murder, which mirror the elements contained in the jury charge, were proven below.

Provided that we find below that the Lewises' convictions are not reversible due to trial error, remand for resentencing is not warranted in this case. Resentencing is only required where the district court has imposed a sentence that exceeded the maximum sentence that the defendant would have received if sentenced under the applicable federal statute. In Hockenberry, the court explained that resentencing was necessary because the indictment could not support the ten-year sentence Hockenberry received. 422 F.2d at 174. Though the maximum sentence under the California statute was ten years, the maximum sentence available under the federal statute was only five years. Accordingly, the court instructed the district court on remand to reduce the sentence to comport with the federal penalty.

In United States v. Hall, 979 F.2d 320, 323 (3d Cir. 1992), the Third Circuit refused to remand for sentencing because "the sentence imposed on Hall was not higher than that which could have been convicted under the CFR." The CFR provided punishment consisting of a fine not exceeding $500, or six months imprisonment, or both, plus costs. The district court sentenced Hall to 45 days imprisonment and a fine of $300. The Hall court found no prejudice and no need for remand.

13

Here, the Lewises did not receive a sentence exceeding the maximum sentence allowed under the federal murder statute. The United States Code makes second degree murder punishable by imprisonment "for any term of years or *for life*." 18 U.S.C. § 1111 (emphasis added). Mr. and Mrs. Lewis both received life sentences. Unlike Hockenberry, the Lewises' sentences are supported by their joint indictment. Therefore, we need not remand for resentencing.

## C.     CLAIMS OF TRIAL ERRORS.

Our conclusions regarding the defective, but not fatal, indictment and the appropriate remedy for the flawed assimilation do not end the discussion. We still must determine whether the convictions can stand in the face of the other trial errors alleged by the defendants. After a thorough review of the record, we find no reason to reverse the Lewises' convictions. We will, however, discuss the Lewises' specific contentions of error below.

### 1.     *Sufficiency of the Evidence.*

Both Lewises claim that there was insufficient evidence to prove that they had specific intent to kill or inflict great bodily harm on Jadasha. Mr. Lewis claims that there is overwhelming evidence suggesting that Mrs. Lewis had a plausible motive (i.e., jealousy) to harm Jadasha and that she delivered the murderous blows to Jadasha; whereas, the evidence merely places him on the premises on the day of the murder. Mr. Lewis lists several witnesses who testified as to Mrs. Lewis's jealousy and abuse of Jadasha. Only Mrs. Lewis and her two daughters testified that Mr. Lewis hit Jadasha. Not even they testified that he hit Jadasha on the head. Moreover, the pathologist testified that he had to dissect Jadasha's body to see the extent of the bruising, and that the visible marks cannot be characterized as "great bodily harm."

Similarly, Mrs. Lewis admits to disciplining Jadasha, but denies that the discipline resulted in significant injury. She points primarily to testimony of the pathologist in support of her insufficient evidence claim. He testified that (1) the hemorrhages and bruises on Jadasha's head would not have been visible through her scalp and hair, (2) the deep bruises evident on the pre-autopsy and autopsy photographs of Jadasha were not visible at the time she died and had to work their way to the surface

14

of her skin, (3) the body bruises might not be visible if Jadasha was wearing clothes, (4) there was no evidence that the brain hematomas were directly related to the contusions found on Jadasha's scalp, and (5) the contusions and deep hemorrhages were caused by objects like an adult's hand; one would not expect a fly swatter or 3/8" diameter switch[12] to inflict these injuries. Mrs. Lewis also argues that none of the many witnesses called by the government or the defendants testified that they saw Mrs. Lewis strike Jadasha or use unusual or excessively cruel discipline measures on her. She further asserts that "even though [Jadasha] died, that is not in and of itself murder."

The standard for reviewing the sufficiency of the government's evidence is whether a reasonable trier of fact could have found that the evidence established the appellant's guilt beyond a reasonable doubt. United States v. Stedman, 69 F.3d 737, 739 (5th Cir. 1995); and United States v. Ruggiero, 56 F.3d 647, 654 (5th Cir.), cert. denied, 116 S. Ct. 486 (1995). We must review the evidence in the light favorable to the guilty verdict, that is, in the light most favorable to the government. See United States v. Tannehill, 49 F.3d 1049, 1054 (5th Cir.), cert. denied, 116 S. Ct. 167 (1995). Further, we must consider all reasonable inferences arising from the evidence in the light most favorable to the government. Id.

Under Revised Statute 14:30A(5), the government had to prove that the Lewises killed Jadasha with specific intent to kill or inflict great bodily harm upon a victim under the age of twelve. Further, the government had to satisfy its burden of proving that the Lewises were guilty beyond a reasonable doubt; proving only that the Lewises *could be guilty* is insufficient to satisfy this burden. United States v. Sacerio, 952 F.2d 860, 863 (5th Cir. 1992). Because Jadasha's age and death are undisputed, we proceed to the issue of the defendants' intent.

We find that the record fully supports the defendants' convictions. Their arguments ignore the vast amount of circumstantial evidence which was sufficient to allow a jury to infer that they were guilty of murdering Jadasha. In the defendants' statements given contemporaneously with the investigation into Jadasha's death both admitted to beating Jadasha numerous times within the

---

[12]A "switch" is a light branch from a tree or bush used to discipline by striking.

15

twenty-four hours preceding her death. Mr. Lewis shook Jadasha several times and hit her with his hand or a fly swatter, while Mrs. Lewis hit her with a fly swatter, coat hanger, and switches. Further, because they spent the day together, the Lewises were aware of the beatings administered by the other that day. A military police officer testified that soon after learning that Jadasha was dead Mr. Lewis told the military police officers "I shouldn't have done it; I shouldn't have spanked her like that." Other military police officers testified that Mrs. Lewis made spontaneous statements that "she only had to whip [Jadasha] three times that day" and "she shouldn't have hit the child. If the child would be okay, then she would not punish her again." In addition, both related a version of an incident in which Mr. Lewis was beating Jadasha, she ran in her room or was instructed to go to her room, and then Mrs. Lewis called her from the room, wherein Mr. Lewis beat Jadasha again. Further, during the ride to the correctional facility Mr. Lewis was overheard asking investigator McCormick how pleading guilty to a charge relating to homicide would affect his military career.

Testimony from a paramedic, emergency personnel, a pediatrician, and a forensic pathologist attested to outward signs that demonstrated the extent of Jadasha's injuries. Testimony indicates that flesh wounds on Jadasha "were still oozing blood" when she arrived in the emergency room. The paramedic describes a mark on Jadasha's forehead, a swollen lip, blood matted in her hair, blood on the top of her left ear, skin missing from her left ear, and marks on her body from a fly swatter or a coat hanger. The injuries on her body were consistent with an adult's open hand, a fly swatter, a hanger, and a curtain rod.

The pediatrician's testimony corroborated the testimony of the paramedic and emergency room personnel. Additionally, he said that Jadasha's abdomen was tense, indicating the possibility of abdominal trauma. The cartilage appeared to be fractured in Jadasha's left ear. Jadasha had suffered multiple repeated trauma to her body. Moreover, the pediatrician agreed that the injuries qualified as "great serious injuries."

Similarly, the forensic pathologist's description of the crime scene showed that the blood of the slaughter remained in the house. Several blood drops appeared all over the floor of the living

16

room and on the floor of Jadasha's room. Blood was found on pieces of a curtain rod found crumpled in the Lewises' garbage can. Dried blood spots were visible on the sofa, on the window curtail, on the closet doors in the hallway, in the master bedroom closet, and on walls. One blood spot on the wall looked like a child's smeared hand print. Blood appeared on articles of clothing and blankets. In addition to the blood spots, the pathologist found several pieces of broken twigs in Jadasha's room, two unusually thick and bulky fly swatters, which he said "didn't look like what you would think a fly swatter would look like." He also found a clump of hair that appeared to be pulled out of the scalp.

The forensic pathologist counted over two hundred injuries on Jadasha's body caused by non-accidental injury. He matched the shape of Jadasha's injuries with the weapons the Lewises admitted using to beat Jadasha. He also testified regarding the nature of the old and new wounds covering her body. In great detail he described the raw sores, lacerations, and callouses evident on both sides of Jadasha's buttocks, which were caused from chronic, repetitive injuries. The pathologist testified that (with the exception of some areas on the buttocks, the left ear, and scars from a hot liquid burn) the injuries to Jadasha's body were inflicted within twenty-four hours of her death because there was "recent bleeding in the underlying tissue." So much blood was redirected into the tissues underlying the injuries that Jadasha's circulatory system was missing one-third to two-third of the blood normally found in the circulatory system. The pathologist explained that an adult's hand, rather than the twigs, coat hanger, or fly swatter, probably caused the deeper hemorrhages. He said the massive hemorrhaging could have eventually caused Jadasha's death; however, he said Jadasha died from cerebral edema (brain swelling), caused by a blow to her head. The pathologist conservatively counted nine head injuries, any one of which was sufficient to cause Jadasha's death. He said that the amount of force necessary to cause the brain to swell is equivalent to dropping a child on its head from a height higher than three feet onto an uncarpeted floor. Further, the pathologist discussed contusions on Jadasha's forehead, on both cheeks, and over the bridge on her nose as well as

scratches and cuts in her face. He also said that several coat hanger type abrasions appeared in Jadasha's face.

Neighbors and friends of the Lewises also attested to the history of abuse to which Jadasha was subjected, primarily by Mrs. Lewis. For example, Amber Nantz, who visited the Lewises testified that she observed injuries on Jadasha on several occasions. When Mrs. Lewis explained in Jadasha's presence how a large black eye occurred, "Jadasha kind of had a funny expression on her fac[e], a funny look on her face that she didn't know what Debra was talking about." Mrs. Nantz also related that Mrs. Lewis withheld food from Jadasha for three days to teach her a lesson, and during that time she would intentionally eat food in front of Jadasha to see if Jadasha would admit to her hunger. Numerous other witnesses corroborated the signs of injury and abuse inflicted on Jadasha. Another person witnessed Jadasha with a black eye. Several attested to seeing the burn on Jadasha's ear and hearing of the three days of starvation. Most indicated that Debra voluntarily spoke of disciplining Jadasha, and they consistently indicated that the Lewises said they disciplined Jadasha by spanking her with their hands or a fly swatter. A few remembered Debra stating that "if she didn't stop whipping Jadasha she would hurt her or kill her" and "she was going to let James whip [Jadasha because] [s]he wasn't going to go to jail for killing that child." One witness testified that when Mrs. Lewis discussed beating Jadasha, her demeanor demonstrated that Mrs. Lewis thought the disciplining was funny. She also said Mrs. Lewis told her Jadasha had sores on her when she came to live with the Lewises and it therefore was necessary to bathe her in bleach. Another witness testified that she saw Mrs. Lewis strike Jadasha and burst her lip. At least one witness reported the starvation incident to the sergeant, and a few suggested to the Lewises that they needed counseling.

After viewing the evidence in favor of the government, we find the record abundant with evidence to prove that the Lewises had specific intent to inflict great bodily harm upon Jadasha and that they aided and abetted each other in the beatings. There was sufficient evidence regarding the events of the day for the jury to conclude that the Lewises were aware that the other was beating Jadasha and that they assisted each other in some capacity in the beatings. Mr. and Mrs. Lewis both

18

beat Jadasha repeatedly throughout the day of her death. There is no testimony that any other person contributed to the beatings Jadasha endured the day of her death. Without question because of the force accompanying their blows and the numerous beatings administered with that amount of force, the Lewises intended to cause Jadasha serious bodily harm.

The Lewises claim that they could not have known the effect of their blows because the deep bruises did not surface until later. They also say that they could not have seen the bruises through her clothes. We find this reasoning implausible and disingenuous. First, there was blood visible on Jadasha, her clothes, the walls, floors, window curtain, and the instruments used to beat Jadasha. Some of Jadasha's injuries still oozed blood when she reached the emergency room. The jury could infer that a blow from an adult to a forty-two pound four-year-old with enough force to draw blood capable of leaving the trail described above comes with specific intent to inflict great bodily harm.

Second, Jadasha had several old injuries on her body, especially on the cheeks of her buttocks. The Lewises had proof that the force of their blows would produce injury to Jadasha. This proof did not deter their beatings; instead, they administered many more blows of equal or greater force. We find that the Lewises did not have to see the recently created bruises to know that their blows were in fact causing serious internal injuries. Further, testimony revealed that the body blows would have caused Jadasha's death if the head injuries had not killed her. The jury could conclude that non-accidental blows of this quantity and intensity on a forty-two pound four-year-old from an adult could only come with the specific intent to inflict serious bodily harm on the child.[13] Likewise, the jury could find that blows from an adult to the abdomen of a child of this age and size came with like intent.

Finally, the Lewises struck Jadasha on the head and caused her brain to swell. Testimony from the pathologist clarified the significance of this type of head injury. The jury reasonably could deduce

---

[13]We are convinced that the Lewises would not have sought medical treatment and would have treated the body bruises themselves with bleach and peroxide as they had treated Jadasha's injuries in the past.

that a non-accidental blow to a four-year-old's head with force greater than a three-foot fall can only come with specific intent to cause serious bodily harm.

We conclude that there was more than enough evidence for a jury to find beyond a reasonable doubt that Mr. and Mrs. Lewis possessed specific intent to inflict great bodily harm on Jadasha. We reject the Lewises' arguments that the evidence was insufficient; the evidence here allows more than an inference that the defendants beat Jadasha mercilessly and repeatedly throughout the day on her head and body, using far more force that would be acceptable to discipline a four-year-old child. Thus, the Lewises' convictions for first degree murder under Louisiana law could not be reversed on this ground.

### 2. *Admissibility of the Photographs.*

The Lewises argue that the prejudicial effect of the photographs outweighed their probative value. Additionally, Mr. Lewis asserts that the autopsy photos, which were unusually gruesome and inflammatory, were unfair because the dissections depicted the extent of the bruising, which he could not have known prior to the autopsy.

We review the admissibility of photographic evidence for abuse of discretion. United States v. Follin, 979 F.2d 369, 375 (5th Cir. 1992). We find that the district court properly weighed the probative value against the prejudicial effect when evaluating the admissibility of the photographs. See Fed. R. Evid. 403. The court found the photos relevant to the issue of the defendants' intent and the issue regarding absence of accident. We agree that the photos are relevant for these reasons. Grueso me photographs are relevant when they establish an element of the crime charged. United States v. Bowers, 660 F.2d 527 (5th Cir. Unit B Sept. 1981); United States v. McRae, 593 F.2d 700, 707 (5th Cir.), cert. denied, 444 U.S. 862 (1979); and United States v. Kaiser, 545 F.2d 467, 476 (5th Cir. 1977). We also agree with the government that under the facts of this case the photos were relevant to counter claims that the Lewises' employed normal disciplinary measures. The extensive bruising divulges the excessive force behind the Lewises' supposedly disciplinary blows. The photos are the best means of conveying to the jury the force behind the blows.

Further, we find that the potential prejudice was consciously minimized here. The district court avoided duplication and limited the prejudicial effect of the photos by requiring the government to reduce the number of photos to be shown to the jury. Of the approximately 130 photos, the government entered only 16 into evidence. In another child abuse case resulting in death, we commented that the photos of the child's lacerated heart

> had the potential to inflame the jury, but we consider it no more inflammatory than photographs that portray this sort of death suffered by the victim in this or any other case where the circumstances of the death are at issue. United States v. Kaiser, 545 F.2d 467, 476 (5th Cir. 1977). The photograph, here, was essential to the government's case if it was to meet its burden of showing that appellant brought cruel and excessive physical force to bear on her child.

Bowers, 660 F.2d at 529. Thus, the district court acted well within its discretion when allowing the government to present the photos to the jury.

### 3. *Admissibility of the Lewises' Statements.*

The Lewises argue that the district court erred by overruling their objections to the adequacy of the advice of rights given to them when they gave statements to investigators. Mr. Lewis asserts that he was not informed that he had a right to a private attorney. Mrs. Lewis claims that she was not advised of her rights until six hours after her initial detention at the hospital, that because of her emotional state she could not comprehend the severity of the situation, that the length of time to give the statement demonstrates the presence of coercion, that she believed the statement had to be given before she could she her son and Jadasha's body, and that she failed to understand the warnings given.

The Supreme Court in United States v. Miranda, 384 U.S. 436, 479 (1966) established the warnings that a defendant must receive in order for his statement to be admissible at trial. The defendant is free to waive the rights conveyed in the warnings if the waiver is done (1) voluntarily and (2) knowingly and intelligently. United States v. Andrews, 22 F.3d 1328, 1337 (5th Cir.), cert. denied, 115 S. Ct. 346 (1994).

In the present case, the district court held a suppression hearing wherein he heard live testimony from investigators and Mrs. Lewis regarding the warnings given to the defendants. The

testimony indicates that the Lewises each received a form containing the customary <u>Miranda</u> warnings. The district court found that the military form given to Mr. Lewis adequately apprised him of his rights and allowed him to knowingly waive his rights. Mrs. Lewis received the FBI Miranda warnings form, which she initialed. Additionally, the district court questioned Mrs. Lewis regarding her statements.[14] The court concluded that Mrs. Lewis understood that she was waiving her rights and voluntarily waived the rights after being adequately advised by an investigator. The district court admitted the statements into evidence after making these determinations.

The district court saw the live testimony and was in a position to factor body language into its credibility determinations. Accordingly, with the exception of the voluntary issue, we must accept the district court's factual findings regarding the interrogations unless the findings are clearly erroneous. <u>United States v. Foy</u>, 28 F.3d 464, 474 (5th Cir.), <u>cert. denied</u>, 115 S. Ct. 610 (1994). We cannot say that these findings are clearly erroneous based upon the record before us.

The issue of voluntariness is a legal question subject to de novo review. <u>Andrews</u>, 22 F.3d at 1340 n.12. A waiver is voluntary when it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>Id.</u> at 1337. Nothing in the record demonstrates that the Lewises waived their rights because of intimidation, coercion, or deception. We cannot say that the district court erred in denying the Lewises' motions to suppress their statements.

### 4. *The Battered Woman's Syndrome Defense.*

Mrs. Lewis argues that she suffered from Battered Women's Syndrome which diminished her capacity to develop specific intent to kill of inflict great bodily harm on Jadasha or to aid and abet Mr. Lewis to do the same. We concluded above that the government presented sufficient evidence to allow the jury to find that Mrs. Lewis had specific intent to inflict great bodily harm on Jadasha. The

---

[14]Mrs. Lewis actually gave two statements. Mrs. Lewis asked to give a second statement so that she could correct inaccurate statements made in the first statement.

jury heard and evaluated the testimony regarding Battered Women's Syndrome. The jury chose not to believe that the Syndrome affected her ability to develop the intent necessary to commit murder. We find no basis in the record to disturb the jury's credibility choices. See United States v. Garcia, 86 F.3d 394, 398 (5th Cir. 1996) (noting that the appellate court must accept the credibility choices supporting the verdict); and United States v. Straach, 987 F.2d 232, 237 (5th Cir. 1993) (noting that the appellate court cannot weigh and assess the credibility of the witnesses).

Based on our evaluations of the record, we find no merit to any of the Lewises' evidentiary claims of error. Therefore, we will not compel the government to waste time and resources reindicting the Lewises, duplicating the trial, presenting the same sufficient evidence, and proving the same elements where the jury has already spoken loudly, clearly, and correctly. The jury found the Lewises guilty and, under the circumstances of this case, a new trial would not change this.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the convictions and sentences of James M. Lewis and Debra Faye Lewis for murder of Jadasha D. Lowery even though the indictment erroneously charged them with first degree murder under La. Rev. Stat. § 14:30A(5) pursuant to the Assimilative Crimes Act rather than 18 U.S.C. § 1111.