# LEWIS *v.* UNITED STATES

No. 96–7151.  Argued November 12, 1997—Decided March 9, 1998

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post,* p. 173. KENNEDY, J., filed a dissenting opinion, *post,* p. 180.

*Frank Granger* argued the cause and filed briefs for petitioner.

*Malcolm L. Stewart* argued the cause for the United States. With him on the brief were *Acting Solicitor General Waxman, Acting Assistant Attorney General Keeney, Deputy Solicitor General Dreeben,* and *Deborah Watson.** 

---

*\*John Lanahan* and *Barbara E. Bergman* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae.*

JUSTICE BREYER delivered the opinion of the Court.

The federal Assimilative Crimes Act (ACA or Act) assimilates into federal law, and thereby makes applicable on federal enclaves such as Army bases, certain criminal laws of the State in which the enclave is located. It says:

> "Whoever within or upon any [federal enclave] is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State . . . in which such place is situated, . . . shall be guilty of a like offense and subject to like punishment." 18 U. S. C. § 13(a).

The question in this case is whether the ACA makes applicable on a federal Army base located in Louisiana a state first-degree murder statute that defines first-degree murder to include the "killing of a human being . . . [w]hen the offender has the specific intent to kill or to inflict great bodily harm upon a victim under the age of twelve . . . ." La. Rev. Stat. Ann. § 14:30(A)(5) (West 1986 and Supp. 1997).

We hold that the ACA does not make the state provision part of federal law. A federal murder statute, 18 U. S. C. § 1111, therefore governs the crime at issue—the killing of a 4-year-old child "with malice aforethought" but without "premeditation." Under that statute this crime is second-degree, not first-degree, murder.

## I

A federal grand jury indictment charged that petitioner, Debra Faye Lewis, and her husband James Lewis, beat and killed James' 4-year-old daughter while all three lived at Fort Polk, a federal Army base in Louisiana. Relying on the ACA, the indictment charged a violation of Louisiana's first-degree murder statute. La. Rev. Stat. Ann. § 14:30 (West 1986 and Supp. 1993). Upon her conviction, the Dis-

trict Court sentenced Debra Lewis to life imprisonment without parole. See § 14:30(C) (West 1986).

On appeal the Fifth Circuit held that Louisiana's statute did not apply at Fort Polk. 92 F. 3d 1371 (1996). It noted that the Act made state criminal statutes applicable on federal enclaves only where the wrongful "'act or omission'" was "'not made punishable by any enactment of Congress.'" *Id.,* at 1373–1374 (citing 18 U. S. C. § 13). Because Congress made Lewis' acts "punishable" as federal second-degree murder, and the federal and state laws were directed at roughly the same sort of conduct, the Fifth Circuit reasoned that the ACA did not permit the application of Louisiana's first-degree murder statute to petitioner's acts. 92 F. 3d, at 1375–1377. The court nonetheless affirmed Lewis' conviction on the ground that in convicting her of the state charge the jury had necessarily found all of the requisite elements of federal second-degree murder. *Id.,* at 1378; cf. *Rutledge* v. *United States,* 517 U. S. 292, 305–306 (1996). And it affirmed the sentence on the ground that it was no greater than the maximum sentence (life) permitted by the federal second-degree murder statute. 92 F. 3d, at 1379–1380.

We granted certiorari primarily to consider the Fifth Circuit's ACA determination. We conclude that the holding was correct, though we also believe that Lewis is entitled to resentencing on the federal second-degree murder conviction.

## II

The ACA applies state law to a defendant's acts or omissions that are "not made punishable by *any enactment* of Congress." 18 U. S. C. § 13(a) (emphasis added). The basic question before us concerns the meaning of the italicized phrase. These words say that the ACA does *not* assimilate a state statute if the defendant's "act" or "omission" is punished by "any [federal] enactment." If the words are taken literally, Louisiana's law could not possibly apply to Lewis,

for there are several federal "enactments" that make Lewis' acts punishable, for example, the federal (second-degree) murder statute, § 1111, and the federal assault law, § 113. We agree with the Government, however, that this is not a sensible interpretation of this language, since a literal reading of the words "any enactment" would dramatically separate the statute from its intended purpose.

The ACA's basic purpose is one of borrowing state law to fill gaps in the federal criminal law that applies on federal enclaves. See *Williams* v. *United States,* 327 U. S. 711, 718–719 (1946) (ACA exists "to fill in gaps" in federal law where Congress has not "define[d] the missing offenses"); *United States* v. *Sharpnack,* 355 U. S. 286, 289 (1958) (ACA represents congressional decision of "adopting for otherwise undefined offenses the policy of general conformity to local law"); *United States* v. *Press Publishing Co.,* 219 U. S. 1, 9–10 (1911) (state laws apply to crimes "which were not previously provided for by a law of the United States"); *Franklin* v. *United States,* 216 U. S. 559, 568 (1910) (assimilation occurs where state laws "not displaced by specific laws enacted by Congress").

In the 1820's, when the ACA began its life, federal statutory law punished only a few crimes committed on federal enclaves, such as murder and manslaughter. See 1 Stat. 113. The federal courts lacked the power to supplement these few statutory crimes through the use of the common law. See *United States* v. *Hudson,* 7 Cranch 32, 34 (1812). Consequently James Buchanan, then a Congressman, could point out to his fellow House Members a "palpable defect in our system," namely, that "a great variety of actions, to which a high degree of moral guilt is attached, and which are punished . . . at the common law, and by every State . . . may be committed with impunity" on federal enclaves. 40 Annals of Cong. 930 (1823). Daniel Webster sought to cure this palpable defect by introducing a bill that both increased the number of federal crimes and also made "the residue"

criminal, see 1 Cong. Deb. 338 (1825), by assimilating state law where federal statutes did not provide for the "punishment" of an "offence." 4 Stat. 115. This law, with only a few changes, has become today's ACA. See *Williams, supra,* at 719–723 (describing history of ACA).

Two features of the Act indicate a congressional intent to confine the scope of the words "any enactment" more narrowly than (and hence extend the Act's reach beyond what) a literal reading might suggest. First, a literal interpretation of the words "any enactment" would leave federal criminal enclave law subject to gaps of the very kind the Act was designed to fill. The Act would be unable to assimilate even a highly specific state law aimed directly at a serious, narrowly defined evil, if the language of *any* federal statute, however broad and however clearly aimed at a different kind of harm, were to cover the defendant's act. Were there only a state, and no federal, law against murder, for example, a federal prohibition of assault could prevent the state statute from filling the obvious resulting gap.

At the same time, prior to its modern amendment the ACA's language more clearly set limits upon the scope of the word "any." The original version of the ACA said that assimilation of a relevant state law was proper when "any offence shall be committed . . . the punishment of which *offence* is not specially provided for by any law of the United States." 4 Stat. 115 (emphasis added); see also 30 Stat. 717 (later reenactment also using "offense"). The word "offense" avoided the purpose-thwarting interpretation of the Act discussed above, for it limited the relevant federal "enactment" to an enactment that punished *offenses* of the same *kind* as those punished by state law. Presumably, a federal assault statute would not have provided punishment for the "offense" that state murder law condemned. Congress changed the Act's language in 1909, removing the word "offense" and inserting the words "act or thing," 35 Stat. 1145, which later became the current "act or omission." But Con-

gress did so for reasons irrelevant here, see H. R. Rep. No. 2, 60th Cong., 1st Sess., 25 (1908) (stating that, technically speaking, conduct otherwise not forbidden by law was not an "offense"), and did not intend to alter the basic meaning of the Act. See *Williams, supra,* at 722–723.

For these or similar reasons, many lower courts have interpreted the words "any enactment" more narrowly than a literal reading might suggest. And they have applied the Act to assimilate state statutes in circumstances they thought roughly similar to those suggested by our assault/ murder example above. See, *e. g., United States* v. *Kaufman,* 862 F. 2d 236, 238 (CA9 1988) (existence of federal law punishing the carrying of a gun does not prevent assimilation of state law punishing threatening someone with a gun); *Fields* v. *United States,* 438 F. 2d 205, 207–208 (CA2 1971) (assimilation of state malicious shooting law proper despite existence of federal assault statute); *United States* v. *Brown,* 608 F. 2d 551, 553–554 (CA5 1979) (child abuse different in kind from generic federal assault, and so state law could be assimilated). But see *United States* v. *Chaussee,* 536 F. 2d 637, 644 (CA7 1976) (stating a more literal test). Like the Government, we conclude that Congress did not intend the relevant words—"*any* enactment"—to carry an absolutely literal meaning.

On the other hand, we cannot accept the narrow interpretation of the relevant words (and the statute's consequently broader reach) that the Solicitor General seems to urge. Drawing on our language in *Williams, supra,* at 717, some lower courts have said that the words "any enactment" refer only to federal enactments that make criminal the same "precise acts" as those made criminal by the relevant state law. See, *e. g., United States* v. *Johnson,* 967 F. 2d 1431, 1436 (CA10 1992). The Government apparently interprets this test to mean that, with limited exceptions, the ACA would assimilate a state law so long as that state law defines a crime in terms of at least one element that does

not appear in the relevant federal enactment. See Tr. of Oral Arg. 27 ("[I]n the great majority of cases the question of whether the State law offense has been made punishable by an enactment of Congress can be resolved by asking, is there a Federal statute that contains precisely the same essential elements as the State statute"). But this interpretation of federal "enactments" is too narrow.

The Government's view of the "precise acts" test—which comes close to a "precise elements" test—would have the ACA assimilate state law even where there is no gap to fill. Suppose, for example, that state criminal law (but not federal criminal law) makes possession of a state bank charter an element of an offense it calls "bank robbery"; or suppose that state law makes purse snatching criminal under a statute that is indistinguishable from a comparable federal law but for a somewhat different definition of the word "purse." Where, one might ask, is the gap? As Congress has enacted more and more federal statutes, including many that are applicable only to federal enclaves, see, e. g., 18 U. S. C. § 113 (assault); § 1460 (possession with intent to sell obscene materials), such possibilities become more realistic. And to that extent the Government's broad view of assimilation threatens not only to fill nonexistent gaps, but also to rewrite each federal enclave-related criminal law in 50 different ways, depending upon special, perhaps idiosyncratic, drafting circumstances in the different States. See *Williams*, 327 U. S., at 718 (ACA may not be used to "enlarg[e] . . . modif[y] or repea[l] existing provisions of the Federal Code"). It would also leave residents of federal enclaves randomly subject to three sets of criminal laws (special federal territorial criminal law, general federal criminal law, and state criminal law) where their state counterparts would be subject only to the latter two types.

Nothing in the Act's language or in its purpose warrants imposing such narrow limits upon the words "any enactment" and thereby so significantly broadening the statute's

reach. Nor does the use by this Court of the words "precise acts" in the leading case in which this Court has applied the Act, *Williams*, 327 U. S., at 717, help the Government in this respect. In *Williams*, the Court held that the ACA did not assimilate a State's "statutory rape" crime (with a cut-off age of 18) both because federal adultery and fornication statutes covered the defendant's "precise acts," and because the policies underlying a similar federal statute (with a cutoff age of 16) made clear there was no gap to fill. *Id.*, at 724–725. The Court's opinion refers to both of these circumstances and does not decide whether the Act would, or would not, have applied in the absence of only one. We cannot find a convincing justification in language, purpose, or precedent for the Government's interpretation. Hence, we conclude that, just as a literal interpretation would produce an ACA that is too narrow, see *supra*, at 161–162, so the Government's interpretation would produce an ACA that is too broad.

In our view, the ACA's language and its gap-filling purpose taken together indicate that a court must first ask the question that the ACA's language requires: Is the defendant's "act or omission . . . made punishable by *any* enactment of Congress." 18 U. S. C. § 13(a) (emphasis added). If the answer to this question is "no," that will normally end the matter. The ACA presumably would assimilate the statute. If the answer to the question is "yes," however, the court must ask the further question whether the federal statutes that apply to the "act or omission" preclude application of the state law in question, say, because its application would interfere with the achievement of a federal policy, see *Johnson* v. *Yellow Cab Transit Co.*, 321 U. S. 383, 389–390 (1944), because the state law would effectively rewrite an offense definition that Congress carefully considered, see *Williams*, 327 U. S., at 718, or because federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue, see *id.*, at 724 (no assimilation where Congress has "covered the field with uniform fed-

eral legislation"). See also *Franklin*, 216 U. S., at 568 (assimilation proper only where state laws "not displaced by specific laws enacted by Congress").

There are too many different state and federal criminal laws, applicable in too many different kinds of circumstances, bearing too many different relations to other laws, to common-law tradition, and to each other, for a touchstone to provide an automatic general answer to this second question. Still, it seems fairly obvious that the Act will not apply where both state and federal statutes seek to punish approximately the same wrongful behavior—where, for example, differences among elements of the crimes reflect jurisdictional, or other technical, considerations, or where differences amount only to those of name, definitional language, or punishment. See, *e. g., United States* v. *Adams*, 502 F. Supp. 21, 25 (SD Fla. 1980) (misdemeanor/felony difference did not justify assimilation).

The Act's basic purpose makes it similarly clear that assimilation may not rewrite distinctions among the forms of criminal behavior that Congress intended to create. *Williams, supra,* at 717–718 (nothing in the history or language of the ACA to indicate that once Congress has "defined a penal offense, it has authorized such definition to be enlarged" by state law). Hence, ordinarily, there will be no gap for the Act to fill where a set of federal enactments taken together make criminal a single form of wrongful behavior while distinguishing (say, in terms of seriousness) among what amount to different ways of committing the same basic crime.

At the same time, a substantial difference in the kind of wrongful behavior covered (on the one hand by the state statute, on the other, by federal enactments) will ordinarily indicate a gap for a state statute to fill—unless Congress, through the comprehensiveness of its regulation, cf. *Wisconsin Public Intervenor* v. *Mortier*, 501 U. S. 597, 604–605 (1991), or through language revealing a conflicting policy, see

*Williams, supra,* at 724–725, indicates to the contrary in a particular case. See also *Johnson* v. *Yellow Cab, supra,* at 389–390; *Blackburn* v. *United States,* 100 F. 3d 1426, 1435 (CA9 1996). The primary question (we repeat) is one of legislative intent: Does applicable federal law indicate an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue?

## III

We must now apply these principles to this case. The relevant *federal murder statute*—applicable *only on federal enclaves*—read as follows in 1993, the time of petitioner's crime:

"§ 1111. Murder

"(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

"Any other murder is murder in the second degree.

"(b) Within the special maritime and territorial jurisdiction of the United States,

"Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment', in which event he shall be sentenced to imprisonment for life;

"Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life." 18 U. S. C. § 1111 (1988 ed.).

This statute says that "murder in the first degree" shall be punished by death or life imprisonment. It says that "murder in the second degree" shall be punished by imprisonment for "any term of years or for life." It defines first-degree murder as a "willful, deliberate, malicious, and premeditated killing," and also adds certain kinds of felony murder (*i. e.*, murder occurring during the commission of other crimes) and certain instances of transferred intent (*i. e.*, D's killing of A, while intending to murder B). It defines second-degree murder as "[a]ny other murder."

Louisiana's statute says the following:

"A. First degree murder is the killing of a human being:

"(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, drive-by shooting, first degree robbery, or simple robbery.

"(2) When the offender has a specific intent to kill or to inflict great bodily harm upon a fireman or peace officer engaged in the performance of his lawful duties;

"(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; or

"(4) When the offender has specific intent to kill or inflict great bodily harm and has offered, has been offered, has given, or has received anything of value for the killing.

"(5) *When the offender has the specific intent to kill or to inflict great bodily harm upon a victim under the age of twelve or sixty-five years of age or older.*

"(6) When the offender has the specific intent to kill or to inflict great bodily harm while engaged in the distribution, exchange, sale, or purchase, or any attempt thereof, of a controlled dangerous substance listed in

Schedules I, II, III, IV, or V of the Uniform Controlled Dangerous Substances Law.

"(7) When the offender has specific intent to kill and is engaged in the activities prohibited by R. S. 14:107.1(C)(1).

.       .        .        .        .

"C. Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the determination of the jury." La. Rev. Stat. Ann. § 14:30 (West 1986 and Supp. 1997) (emphasis added).

This statute says that murder in the first degree shall be punished by "death or life imprisonment" without parole. It defines first-degree murder as the "killing of a human being" with a "specific intent to kill or to inflict great bodily harm" where the "offender" is committing certain other felonies or has been paid for the crime or kills more than one victim, or kills a fireman, a peace officer, someone over the age of 64, or someone under the age of 12. In this case, the jury found that the defendant killed a child under the age of 12 with a "specific intent to kill or to inflict great bodily harm" upon that child.

In deciding whether the ACA assimilates Louisiana's law, we first ask whether the defendant's "act or omission" is "made punishable by *any* enactment of Congress." 18 U. S. C. § 13(a) (emphasis added); see *supra,* at 164. The answer to this question is "yes." An "enactment of Congress," namely, § 1111, makes the defendant's "act . . . punishable" as second-degree murder. This answer is not conclusive, however, for reasons we have pointed out. Rather, we must ask a second question. See *supra,* at 164–165. Does applicable federal law indicate an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue?

We concede at the outset the Government's claim that the two statutes cover different forms of behavior. The federal second-degree murder statute covers a wide range of conduct; the Louisiana first-degree murder provision focuses upon a narrower (and different) range of conduct. We also concede that, other things being equal, this consideration argues in favor of assimilation. Yet other things are not equal; and other features of the federal statute convince us that Congress has intended that the federal murder statute preclude application of a first-degree murder statute such as Louisiana's to a killing on a federal enclave.

The most obvious such feature is the detailed manner in which the federal murder statute is drafted. It purports to make criminal a particular form of wrongful behavior, namely, "murder," which it defines as "the unlawful killing of a human being with malice aforethought." It covers all variants of murder. It divides murderous behavior into two parts: a specifically defined list of "first-degree" murders and all "other" murders, which it labels "second-degree." This fact, the way in which "first-degree" and "second-degree" provisions are linguistically interwoven; the fact that the "first-degree" list is detailed; and the fact that the list sets forth several circumstances at the same level of generality as does Louisiana's statute, taken together, indicate that Congress intended its statute to cover a particular field—namely, "unlawful killing of a human being with malice aforethought"—as an integrated whole. The complete coverage of the federal statute over all types of federal enclave murder is reinforced by the extreme breadth of the possible sentences, ranging all the way from *any* term of years, to death. There is no gap for Louisiana's statute to fill.

Several other circumstances offer support for the conclusion that Congress' omissions from its "first-degree" murder list reflect a considered legislative judgment. Congress, for example, has recently focused directly several times upon the content of the "first-degree" list, subtracting certain speci-

fied circumstances or adding others. See Pub. L. 99–646, 100 Stat. 3623 (substituting "aggravated sexual abuse or sexual abuse" for "rape"); Pub. L. 98–473, 98 Stat. 2138 (adding "escape, murder, kidnaping, treason, espionage," and "sabotage" to first-degree list). By drawing the line between first and second degree, Congress also has carefully decided just when it does, and when it does not, intend for murder to be punishable by death—a major way in which the Louisiana first-degree murder statute (which provides the death penalty) differs from the federal second-degree provision (which does not). 18 U. S. C. § 1111(b); La. Rev. Stat. Ann. § 14:30(C) (West Supp. 1997). The death penalty is a matter that typically draws specific congressional attention. See, e. g., Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103–322, § 60003, 108 Stat. 1968 (section entitled "Specific Offenses For Which [the] Death Penalty Is Authorized"). As this Court said in *Williams*, "[w]here offenses have been specifically defined by Congress and the public has been guided by such definitions for many years," it is unusual for Congress through general legislation like the ACA "to amend such definitions or the punishments prescribed for such offenses, without making clear its intent to do so." 327 U. S., at 718 (footnote omitted).

Further, Congress when writing and amending the ACA has referred to the conduct at issue here—murder—as an example of a crime covered by, not as an example of a gap in, federal law. See H. R. Rep. No. 1584, 76th Cong., 3d Sess., 1 (1940) ("Certain of the major crimes . . . such . . . as murder" are "expressly defined" by Congress; assimilation of state law is proper as to "other offenses"); 1 Cong. Deb. 338 (1825) (Daniel Webster explaining original assimilation provision as a way to cover "the residue" of crimes not "provide[d] for" by Congress; at the time federal law contained a federal enclave murder provision, see 1 Stat. 113); see also *United States* v. *Sharpnack*, 355 U. S., at 289, and n. 5 (citing 18 U. S. C. § 1111 for proposition that Congress has

increasingly "enact[ed] for the enclaves specific criminal statutes" and "to that extent, [has] excluded the state laws from that field").

Finally, the federal criminal statute before us applies only on federal enclaves. § 1111(b). Hence, there is a sense in which assimilation of Louisiana law would treat those living on federal enclaves differently from those living elsewhere in Louisiana, for it would subject them to two sets of "territorial" criminal laws in addition to the general federal criminal laws that apply nationwide. See *supra*, at 163. Given all these considerations, it is perhaps not surprising that we have been unable to find a single reported case in which a federal court has used the ACA to assimilate a state murder law to fill a supposed "gap" in the federal murder statute.

The Government, arguing to the contrary, says that Louisiana's provision is a type of "child protection" statute, filling a "gap" in federal enclave-related criminal law due to the fact that Congress left "child abuse," like much other domestic relations law, to the States. See Brief for United States 23, 29–30. The fact that Congress, when writing various criminal statutes, has focused directly upon "child protection" weakens the force of this argument. See, *e. g.*, 21 U. S. C. §§ 859(a)–(b) (person selling drugs to minors is subject to twice the maximum sentence as one who deals to adults, and repeat offenders who sell to children subject to *three times* the normal maximum); 18 U. S. C. § 1201(g) ("special rule" for kidnaping offenses involving minors, with enhanced penalties in certain cases); §§ 2241(c) and 2243 (prohibiting sexual abuse of minors); § 2251 (prohibiting sexual exploitation of children); § 2251A (selling and buying of children); § 2258 (failure to report child abuse). And, without expressing any view on the merits of lower court cases that have assimilated state child abuse statutes despite the presence of a federal assault law, § 113, see, *e. g., United States* v. *Brown,* 608 F. 2d, at 553–554; *United States* v. *Fesler,* 781 F. 2d 384, 390–391 (CA5 1986), we note that the

federal assault prohibition is less comprehensive than the federal murder statute, and the relevant statutory relationships are less direct than those at issue here. We conclude that the consideration to which the Government points is not strong enough to open a child-related "gap" in the comprehensive effort to define murder on federal enclaves.

For these reasons we agree with the Fifth Circuit that federal law does not assimilate the child victim provision of Louisiana's first-degree murder statute.

## IV

The Fifth Circuit affirmed petitioner's conviction on the ground that the jury, in convicting petitioner under the Louisiana statute, necessarily found all of the requisite elements of the federal second-degree murder offense. 92 F. 3d, at 1379; cf. *Rutledge* v. *United States,* 517 U. S., at 305–306. Petitioner does not contest the legal correctness of this conclusion.

Petitioner, however, does argue that the Fifth Circuit was wrong to affirm her sentence (life imprisonment). She points out that the federal second-degree murder statute, unlike Louisiana's first-degree murder statute, does not make a life sentence mandatory. See 18 U. S. C. § 1111(b) (sentence of "any term of years or for life"). Moreover, the Sentencing Guidelines provide for a range of 168 to 210 months' imprisonment for a first-time offender who murders a "vulnerable victim," United States Sentencing Commission, Guidelines Manual §§ 2A1.2, 3A1.1, and ch. 5, pt. A (Nov. 1994), although a judge could impose a higher sentence by departing from the Guidelines range. See *id.,* ch. 5, pt. K; see also *Koon* v. *United States,* 518 U. S. 81, 92–96 (1996) (describing circumstances for departures).

The Government concedes petitioner's point. The Solicitor General writes:

"If the jury had found petitioner guilty of second degree murder under federal law, the district court would have

been required to utilize the Sentencing Guidelines provisions applicable to that offense, and the court might have imposed a sentence below the statutory maximum. An upward departure from that range, if appropriate, could reach the statutory maximum of a life sentence, but it is for the district court in the first instance to make such a determination. Resentencing under the Guidelines is therefore appropriate if this Court vacates petitioner's conviction on the assimilated state offense and orders entry of a judgment of conviction for federal second degree murder." Brief for United States 38 (footnote and citations omitted).

We consequently vacate the Fifth Circuit's judgment in respect to petitioner's sentence and remand the case for resentencing.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

As the proliferation of opinions indicates, this is a most difficult case. I agree with the Court's conclusion that the Assimilative Crimes Act (ACA), 18 U. S. C. § 13(a), does not incorporate Louisiana's first-degree murder statute into the criminal law governing federal enclaves in that State. I write separately because it seems to me that the Court's manner of reaching that result turns the language of the ACA into an empty vessel, and invites the lower courts to fill it with free-ranging speculation about the result that Congress would prefer in each case. Although I agree that the ACA is not a model of legislative draftsmanship, I believe we have an obligation to search harder for its meaning before abandoning the field to judicial intuition.

The Court quotes the text of the ACA early in its opinion, but then identifies several policy reasons for leaving it behind. The statutory language is deceptively simple.

> "Whoever within or upon any [federal enclave] is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State . . . in which such place is situated, . . . shall be guilty of a like offense and subject to a like punishment." § 13(a).

At first glance, this appears to say that state law is not assimilated if the defendant can be prosecuted under any federal statute. The Court acknowledges this, but concludes that "a literal reading of the words 'any enactment' would dramatically separate the statute from its intended purpose," *ante*, at 160, because, for example, a general federal assault statute would prevent assimilation of a state prohibition against murder.

It seems to me that the term "any enactment" is not the text that poses the difficulty. Whether a federal assault statute (which is assuredly an "enactment") prevents assimilation of a state murder statute to punish an assault that results in death depends principally upon whether fatal assault constitutes the same "act or omission" that the assault statute punishes. Many hypotheticals posing the same issue can readily be conceived of. For example, whether a state murder statute is barred from assimilation by a federal double-parking prohibition, when the behavior in question consists of the defendant's stopping and jumping out of his car in the traffic lane to assault and kill the victim. The federal parking prohibition is sure enough an "enactment," but the issue is whether the "act or omission" to which it applies is a different one. So also with a federal statute punishing insurance fraud, where the murderer kills in order to collect a life insurance policy on the victim.

Many lower courts have analyzed situations like these under what they call the "precise acts" test, see, *e. g., United States* v. *Kaufman,* 862 F. 2d 236 (CA9 1988), which in practice is no test at all but an appeal to vague policy intuitions.

See, *e. g.*, *United States* v. *Brown*, 608 F. 2d 551 (CA5 1979) (striking a child is not the same "precise act" for purposes of a federal assault law and a state law against child abuse). I am skeptical of any interpretation which leaves a statute doing no real interpretive work in most of the hard cases which it was drafted to resolve. On that score, however, the Court's solution is no improvement. After rejecting proposals from the petitioner and from the United States that would have given the ACA more definite content (on the policy grounds that they would produce too little, and too much, assimilation, respectively), the Court invites judges to speculate about whether Congress would approve of assimilation in each particular case.

> "[T]he court must ask . . . whether the federal statutes that apply to the 'act or omission' preclude application of the state law in question, say, because its application would interfere with the achievement of a federal policy, because the state law would effectively rewrite an offense definition that Congress carefully considered, or because federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue . . . . The primary question (we repeat) is one of legislative intent: Does applicable federal law indicate an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue?" *Ante*, at 164, 166 (citations omitted).

Those questions simply transform the ACA into a mirror that reflects the judge's assessment of whether assimilation of a particular state law would be good federal policy.

I believe that the statutory history of the ACA supports a more principled and constraining interpretation of the current language. The original version of the ACA provided for assimilation whenever "any offence shall be committed . . . , the punishment of which offence is not specially provided for by any law of the United States." 4 Stat. 115.

Subsequent amendments replaced the word "offence" with "act or thing," 35 Stat. 1145, and eventually the present formulation, "act or omission." But we held in *Williams* v. *United States*, 327 U. S. 711, 722–723 (1946), that those amendments were designed to respond to a perceived technical deficiency, and that they did not intend to change the meaning of the Act.

*Williams* reached that conclusion by studying the legislative history of the ACA amendments. Although I am not prepared to endorse that particular methodology, reading the ACA against the backdrop of its statutory predecessors does shed some light on its otherwise puzzling language. An "act or omission . . . made punishable by [law]" is the very definition of a criminal "offense," and certainly might have been another way to express that same idea. In addition, the ACA still provides that a defendant charged with an assimilated state crime "shall be guilty of a *like offense* and subject to a like punishment." 18 U. S. C. § 13(a) (emphasis added). Since an interpretation that ascribes greater substantive significance to the amendments would produce such a vague and unhelpful statute, I think that *Williams*'s reading of the ACA was essentially correct. A defendant may therefore be prosecuted under the ACA for an "offense" which is "like" the one defined by state law if, and only if, that same "offense" is not also defined by federal law.

That interpretation would hardly dispel all of the confusion surrounding the ACA, because courts would still have to decide whether the assimilated state offense is "the same" as some crime defined by federal law. As JUSTICE KENNEDY points out in dissent, "[t]here is a methodology at hand for this purpose, and it is the *Blockburger* test we use in double jeopardy law." *Post*, at 182. Two offenses are different, for double jeopardy purposes, whenever each contains an element that the other does not. See, *e. g., Blockburger* v. *United States*, 284 U. S. 299, 304 (1932). That test can be

easily and mechanically applied, and has the virtue of producing consistent and predictable results.

The *Blockburger* test, however, establishes what constitutes the "same offence" for purposes of the traditional practice that underlies the Double Jeopardy Clause, U. S. Const., Amdt. 5. That constitutional guarantee not only assumes a scheme of "offences" much more orderly than those referred to by the ACA (since they are the offenses designed by a single sovereign), but also pursues policy concerns that are entirely different. When it is fair to try a defendant a second time has little to do with when it is desirable to subject a defendant to two separate criminal prohibitions. Thus, for example, double jeopardy law treats greater and lesser included offenses as the same, see, *e. g., Harris* v. *Oklahoma,* 433 U. S. 682 (1977) *(per curiam),* so that a person tried for felony murder cannot subsequently be prosecuted for the armed robbery that constituted the charged felony. That is fair enough; but it is assuredly *not* desirable that a jurisdiction (the federal enclave) which has an armed robbery law not have a felony-murder law. Contrariwise, as the Court's opinion points out, *ante,* at 163, *Blockburger*'s emphasis on the formal elements of crimes causes it to *deny* the "sameness" of some quite similar offenses because of trivial differences in the way they are defined. In other words, the *Blockburger* test gives the phrase "same offence" a technical meaning that reflects our double jeopardy traditions, see *Grady* v. *Corbin,* 495 U. S. 508, 528–536 (1990) (SCALIA, J., dissenting), but that is neither a layman's understanding of the term nor a meaning that produces sensible results for purposes of "gap filling." There is no reason to assume, it seems to me, that Congress had the term of art in the Double Jeopardy Clause in mind when it enacted the ACA.

JUSTICE KENNEDY contends that all of these concerns can be accommodated through adjustments to the *Blockburger* test. In his view, for example, "the existence of a lesser included federal offense does not prevent the assimilation of

a greater state offense under the ACA, or vice versa." *Post*, at 183. He proposes that courts should "look beyond slight differences in wording and jurisdictional elements to discern whether, as a practical matter, the elements of the two crimes are the same." *Post*, at 182. In order to avoid overruling *Williams*, he also suggests that assimilation is improper when "Congress . . . adverts to a specific element of an offense and sets it at a level different from the level set by state law." *Post*, at 183. I admire JUSTICE KENNEDY's effort to construct an interpretation of the ACA that yields more certain and predictable results, but the modifications he proposes largely dispel the virtues of familiarity, clarity, and predictability that would make *Blockburger* the means to such an end. Ultimately, moreover, those modifications are driven by a view of the policies underlying the Act which I do not share. JUSTICE KENNEDY contends that the ACA is primarily about federalism, and that respect for that principle requires a strong presumption in favor of assimilation. *Post*, at 181–182. To the extent that we can divine anything about the ACA's "purpose" from the historical context which produced it, I agree with the Court that the statute was apparently designed "to fill gaps in the federal criminal law" at a time when there was almost no federal criminal law. *Ante*, at 160; see also *Williams, supra*, at 718–719.

Rejecting *Blockburger*'s elements test leaves me without an easy and mechanical answer to the question of when a state and federal offense are the "same" under the ACA. But the language of the original 1825 ACA suggests that the focus of that inquiry should be on the way that crimes were traditionally defined and categorized at common law. It provided that

> ". . . if any offence shall be committed in [an enclave], the punishment of which offence is not specially provided for by any law of the United States, such offence shall . . . receive the same punishment as the laws of the state . . .

provide for the like offence when committed within the body of any county of such state." 4 Stat. 115.

Congress did not provide any methodology for determining whether an "offence" under state law is "provided for by any law of the United States"; the statute appears, instead, to presume the reader's familiarity with a set of discrete "offence[s]" existing apart from the particular provisions of either state or federal statutory law.

In my opinion, the legal community of that day could only have regarded such language as a reference to the traditional vocabulary and categories of the common law. Indeed, the original ACA was at least in part a response to our decision in *United States* v. *Hudson*, 7 Cranch 32 (1812), which held that the federal courts could not recognize and punish common-law crimes in the absence of a specific federal statute. The common law's taxonomy of criminal behavior developed over the centuries through the interplay of statutes and judicial decisions, and its basic categories of criminal offenses remain familiar today: murder, rape, assault, burglary, larceny, fraud, forgery, and so on. I believe that a contemporary reader of the original ACA would have understood it to apply if, and only if, the federal criminal statutes simply failed to cover some significant "offence" category generally understood to be part of the common law.

Since 1825, of course, state and federal legislatures have created a tremendous variety of new statutory crimes that both cut across and expand the old common-law categories. Some of those new "offences" may have become so well established in our common legal culture that their absence from the federal criminal law would now represent a significant gap in its coverage—a gap of the sort the ACA was designed to fill. That possibility introduces an unavoidable element of judgment and discretion into the application of the ACA, and to that extent my interpretation is subject to the same criticisms I have leveled at the approaches taken by the Court and by JUSTICE KENNEDY. But I think that

danger is more theoretical than practical. The structure of the criminal law, like the basic categories of human vice, has remained quite stable over the centuries. There have been a few genuine innovations recently; I have in mind, for example, antitrust or securities crimes which did not exist in 1825. But Congress has been the principal innovator in most of those areas, and I doubt that courts will confront many new "offence" candidates that are not already covered by the federal criminal law. Regardless, the approach outlined above would produce more predictable results than the majority's balancing test, and has the additional virtue of being more firmly grounded in the text and statutory history.

It also produces a clear answer in this case. Ms. Lewis's conduct is not just punishable under some federal criminal statute; it is punishable *as murder* under 18 U. S. C. § 1111. Louisiana's murder statutes are structured somewhat differently from their federal counterparts, but they are still unquestionably murder statutes. Because that "offence" is certainly "made punishable by any enactment of Congress," there is no gap for the ACA to fill. That remains true even if the common-law category at the appropriate level of generality is instead *murder in the first degree.* That "offence" is also defined and punished by the federal criminal law, although the prosecutors in this case apparently did not believe that they could establish its elements. Accordingly, I concur in the judgment, and in Part IV of the majority's opinion.

JUSTICE KENNEDY, dissenting.

As the majority recognizes, the touchstone for interpreting the Assimilative Crimes Act (ACA) is the intent of Congress. *Ante,* at 166. One of Congress' purposes in enacting the ACA was to fill gaps in federal criminal law. *Ante,* at 160. The majority fails to weigh, however, a second, countervailing policy behind the ACA: the value of federalism. The intent of Congress was to preserve state law

except where it is "displaced by specific laws enacted by Congress." *Franklin* v. *United States*, 216 U. S. 559, 568 (1910). In other words, the ACA embodies Congress' "policy of general conformity to local law." *United States* v. *Sharpnack*, 355 U. S. 286, 289 (1958). The majority quotes these passages with approval, *ante*, at 160, yet ignores the principles of federalism upon which they rest.

A central tenet of federalism is concurrent jurisdiction over many subjects. See *McCulloch* v. *Maryland*, 4 Wheat. 316, 425, 435 (1819). One result of concurrent jurisdiction is that, outside federal enclaves, citizens can be subject to the criminal laws of both state and federal sovereigns for the same act or course of conduct. See *Heath* v. *Alabama*, 474 U. S. 82, 88–89 (1985). The ACA seeks to mirror the results of concurrent jurisdiction in enclaves where, but for its provisions, state laws would be suspended in their entirety. Congress chose this means to recognize and respect the power of both sovereigns. We should implement this principle by assimilating state law except where Congress has manifested a contrary intention in "specific [federal] laws." *Franklin, supra*, at 568. But see *ante*, at 163 (suggesting that persons within federal enclaves should not be "randomly subject" to state as well as federal law, even though both sovereigns regulate those outside enclaves).

The majority recognizes that assimilation is not barred simply because the conduct at issue could be punished under a federal statute. It is correct, then, to assume that assimilation depends on whether Congress has proscribed the same offense. *Ante*, at 161–162. Yet in trying to define the same offense, the majority asks whether assimilation would interfere with a federal policy, rewrite a federal offense, or intrude upon a field occupied by the Federal Government. *Ante*, at 164–165. The majority's standards are a roundabout way to ask whether specific federal laws conflict with state laws. The standards take too little note of the value of federalism and the concomitant presumption in favor of

assimilation. And for many concrete cases, they are too vague to be of help.

A more serious problem with the majority's approach, however, is that it undervalues the best indicia of congressional intent: *the words of the criminal statutes in question and the factual elements they define.* There is a methodology at hand for this purpose, and it is the *Blockburger* test we use in double jeopardy law. See *Blockburger* v. *United States,* 284 U. S. 299 (1932); see also *Missouri* v. *Hunter,* 459 U. S. 359, 366–367 (1983) (*Blockburger* is a rule for divining congressional intent). Under *Blockburger,* we examine whether "[e]ach of the offenses created requires proof of a different element." 284 U. S., at 304. In other words, does "each provision requir[e] proof of a fact which the other does not"? *Ibid.*

The same-elements test turns on the texts of the statutes in question, the clearest and most certain indicators of the will of Congress. The test is straightforward, and courts and Congress are already familiar with its dynamic. Following *Blockburger,* a same-elements approach under the ACA would respect federalism by allowing a broad scope for assimilation of state law. The majority rejects this approach, however, because federal and state statutes may have trivial differences in wording or may differ in jurisdictional elements. *Ante,* at 163, 165.

It would be simpler and more faithful to federalism to use a same-elements inquiry as the starting point for the ACA analysis. Courts could use this standard and still accommodate the majority's concerns. Under this view, we would look beyond slight differences in wording and jurisdictional elements to discern whether, as a practical matter, the elements of the two crimes are the same. The majority frets that a small difference in the definitions of purses in federal and state purse-snatching laws would by itself permit assimilation. *Ante,* at 163. But a slight difference in definition need not by itself allow assimilation. See Amar & Marcus,

Double Jeopardy Law After Rodney King, 95 Colum. L. Rev. 1, 38–44 (1995) (advocating a similar approach for double jeopardy claims involving combinations of federal and state offenses). The majority also wonders whether one could assimilate state laws forbidding robbery of state-chartered banks because a federal bank-robbery law did not require a state charter. *Ante,* at 163. But again, a jurisdictional element need not by itself allow assimilation, if all substantive elements of the offenses are identical.

Because the purposes of the ACA and double jeopardy law differ, some other adjustments to *Blockburger* may be necessary. For instance, *Blockburger* treats greater and lesser included offenses as the same to protect the finality of a single prosecution, but finality is not the purpose of the ACA. Congress chooses to allow greater and lesser included offenses to coexist at the federal level, though a particular offender cannot be convicted of both. So too the existence of a lesser included federal offense does not prevent the assimilation of a greater state offense under the ACA, or vice versa. See *ante,* at 171 (citing cases finding federal assault statute does not prevent assimilation of state child-abuse laws).

Another way in which the ACA differs from double jeopardy law is compelled by our own precedent interpreting the ACA. See *Williams* v. *United States,* 327 U. S. 711 (1946). Congress sometimes adverts to a specific element of an offense and sets it at a level different from the level set by state law. When the federal and state offenses have otherwise identical elements, assimilation is not proper. In the *Williams* case, for example, a state statutory-rape law set the age of majority at 18. *Id.,* at 716. Congress had enacted a federal carnal-knowledge statute, setting the age of majority at 16. *Id.,* at 714, n. 6. Once Congress had adverted to and set the age of majority, state law could not be used to rewrite and broaden this particular element. See *id.,* at 717–718, 724–725. Because Congress had manifested

a clear intent to the contrary, assimilation was improper. The same would be true if a state grand-larceny law required a theft of at least $200, while a federal grand-larceny law required a theft of $250 or more.

Congress could have defined first-degree murder to include the killing of children younger than 3, even though state law set the requisite age at 12. Had Congress done so, *Williams* would apply and assimilation of state law would be improper if all other elements were the same. Here, on the other hand, Congress has not taken a victim's age into account at all in defining first-degree murder. The state offense includes a substantive age element missing from the federal statute, so the two do not share the same elements and assimilation is proper. The majority's analysis is more obscure and leads it to an incorrect conclusion. For these reasons, and with all respect, I dissent.