BRISCOE, Chief Judge,
concurring.
I join all but Part IV of the majority’s well reasoned opinion. Part IV of majority opinion addresses two issues: 1) Ms. Christie’s assertion that the state law homicide charges should not have gone to the jury and that she was prejudiced by the resulting multiplicitous counts and erroneous jury instructions, see Aplt. Br. at 19-27; and 2) the government’s cross-appeal in which it asserts that the district court erred in vacating the two state law homicide convictions, see Aplee. Br. at 66-71. I would answer these questions by following the Supreme Court’s approach in Lewis v. United States, 523 U.S. 155, 118 S.Ct. 1135, 140 L.Ed.2d 271 (1998), to conclude that because Congress enacted 18 U.S.C. §§ 1111(a) and 1112(a)—which criminalize second-degree murder and involuntary manslaughter, respectively— there was no need to resort to the ACA as there was no gap in federal law to fill. Any differences with the majority, however, are only in reasoning and not result. I agree in the final analysis that any error in sending the state law homicide charges to the jury was harmless and that the district court did not err in vacating the state law convictions.
I
We review de novo whether a state law crime was properly assimilated under the ACA. United States v. Rocha, 598 F.3d 1144, 1147 (9th Cir.2010). In Lewis, the Supreme Court established a two-step approach for determining whether the ACA permits the assimilation of a particular state law:
[T]he ACA’s language and its gap-filling purpose taken together indicate that a court must first ask the question that the ACA’s language requires: Is the defendant’s “act or omission ... made punishable by any enactment of Congress.” 18 U.S.C. § 13(a) (emphasis added). If the answer to this question is “no,” that will normally end the matter. The ACA presumably would assimilate the statute. If the answer to the questions is “yes,” however, the court must ask the further question whether the federal statutes that apply to the “act or omission” preclude application of the state law in question, say, because its application would interfere with the achievement of a federal policy, because the state law would effectively rewrite an offense definition that Congress carefully considered, or because federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue.
523 U.S. at 164, 118 S.Ct. 1135 (citations omitted). The parties agree that the defendant’s act or omission is made punishable by an act of Congress, so we need only evaluate whether the applicable federal statutes in this case, 18 U.S.C. § 1111(a) (second-degree murder) and 18 U.S.C. § 1112(a) (involuntary manslaughter) preclude application of N.M. Stat. Ann. § 30-6-1 (intentional or negligent child abuse resulting in death).
“The primary question ... is one of legislative intent: Does applicable federal law indicate an intent to punish conduct such as the defendant’s to the exclusion of the particular state statute at issue?” Id. *1177 at 166, 118 S.Ct. 1135. In addressing this question, the Supreme Court noted in Lewis that, “ordinarily, there will be no gap for the Act to fill where a set of federal enactments taken together make criminal a single form of wrongful behavior while distinguishing (say, in terms of seriousness) among what amount to different ways of committing the same basic crime.” Id. at 165, 118 S.Ct. 1135. The Lewis court then applied this standard to determine if the ACA assimilated Louisiana’s first-degree murder statute. For several reasons, the Court concluded that the federal murder statutes precluded application of a first-degree murder statute like Louisiana’s:
The most obvious such feature is the detailed manner in which the federal murder statute is drafted. It purports to make criminal a particular form of wrongful behavior, namely, “murder,” which it defines as “the unlawful killing of a human being with malice aforethought.” It covers all variants of murder. It divides murderous behavior into two parts: a specifically defined list of “first-degree” murders and all “other” murders, which it labels “second-degree.” This fact, the way in which “first-degree” and “second-degree” provisions are linguistically interwoven; the fact that the “first-degree” list is detailed; and the fact that the list sets forth several circumstances at the same level of generality as does Louisiana’s statute, taken together, indicate that Congress intended its statute to cover a particular field—namely, “unlawful killing of a human being with malice aforethought”—as an integrated whole. The complete coverage of the federal statute over all types of federal enclave murder is reinforced by the extreme breadth of the possible sentences, ranging all the way from any term of years, to death. There is no gap for Louisiana’s statute to fill.
Id. at 169,118 S.Ct. 1135.
The Supreme Court also considered Congress’s careful attention to the line between first- and second-degree murder and as to which crimes are punishable by death. Id. at 169-70, 118 S.Ct. 1135. In addition, the Supreme Court found it notable that Congress had referred to murder “as an example of a crime covered by, not as an example of a gap in, federal law.” Id. at 170, 118 S.Ct. 1135. Finally, the Supreme Court rejected the government’s argument that the specific form of first-degree murder it sought to assimilate, which involved the killing of a child under twelve years of age, filled a child-related gap in the federal murder law. The Supreme Court said that “the consideration to which the Government points is not strong enough to open a child-related ‘gap’ in the comprehensive effort to define murder on federal enclaves.” Id. at 172, 118 S.Ct. 1135.[1]
Applying this reasoning to the case at hand, I would conclude that the federal murder and involuntary manslaughter statutes preclude the assimilation of the state child-abuse-resulting-in-death statute in this case. As the Court explained in Lewis, the nature of the federal murder laws shows that Congress intended its first-and-second degree murder statute to cover the unlawful killing of a human being with malice aforethought. We should extend that reasoning to cover involuntary manslaughter, as well. The involuntary manslaughter charge picks up where the *1178 murder charges leave off, and should be considered as part of Congress’s effort to cover, as a whole, the killing of another person.
Moreover, permitting assimilation would seemingly run afoul of the Supreme Court’s concerns about “leav[ing] residents of federal enclaves randomly subject to three sets of criminal laws (special federal territorial criminal law, general federal criminal law, and state criminal law) where their state counterparts would be subject only to the latter two types.” Id. at 163, 118 S.Ct. 1135. In New Mexico, “the general rule [is] that one homicide by the acts of one defendant should result in one homicide conviction.” State v. Mann, 129 N.M. 600, 11 P.3d 564, 570 (N.M.Ct.App.2000). If we permitted the government to assimilate the state laws in this case, Ms. Christie would be subject to additional charges merely for committing the crime on a federal enclave, even though state law forms the basis of two of the underlying convictions.
Indeed, the government’s actions here seem to violate the spirit of the law. The purpose of the ACA is to allow prosecutors the option of using state law when federal law does not punish the specific crime at issue. It strikes me as disingenuous for prosecutors to argue that they need to borrow state law because federal law does not cover this conduct within the meaning of the ACA, but then prosecute on those “insufficient” federal charges as well— even though a state conviction for both murder and child abuse resulting in death in New Mexico would not be upheld because the state legislature intended these to be alternative charges.
II
The government makes two arguments in response. First, the government argues that the state laws and the federal laws do not punish approximately the same behavior, which would argue in favor of assimilation. Second, the government argues that Lewis hinged on Congress’s efforts to limit the crimes for which the death penalty could be imposed. Although these arguments have some merit, neither of them is ultimately persuasive.
While I agree with the government that these statutes no doubt cover different conduct, that alone is not dispositive. As the Supreme Court noted in Lewis:
We concede at the outset the Government’s claim that the two statutes cover different forms of behavior. The federal second-degree murder statute covers a wide range of conduct; the Louisiana first-degree murder provision focuses upon a narrower (and different) range of conduct. We also concede that, other things being equal, this consideration argues in favor of assimilation. Yet other things are not equal; and other features of the federal statute convince us that Congress has intended that the federal murder statute preclude application of a first-degree murder statute such as Louisiana’s to a killing on a federal enclave.
523 U.S. at 169,118 S.Ct. 1135. The Court then concluded that the state law was not assimilated. Likewise, while the federal and state statutes in this case cover different conduct, the other factors are paramount here. Congress has enacted a full set of homicide laws—including a first-degree murder statute that penalizes some forms of child abuse. Further, it is unlikely Congress intended to grant federal prosecutors the ability to secure convictions based on state law using the ACA that state prosecutors could not secure in state court.
As for the second argument, the Lewis court did, of course, discuss the death penalty. The Court supported its conclusion that Louisiana’s first-degree murder statute was not assimilated by noting that the *1179 Louisiana statute could have punished the conduct in question with the death penalty, while the federal murder statutes would not. The Court concluded that it would be unusual for Congress to extend the death penalty to additional crimes using the ACA given the effort Congress had already expended to carefully list and circumscribe the murder crimes that could be punished with the death penalty. This does not, however, fully distinguish Lewis, because Lems does not hinge on the death penalty argument. As discussed above, most of Lewis’s reasoning is still relevant to this case, and should control. And here, it should preclude assimilation.
Ill
Therefore, like the majority, I would reject the government’s cross-appeal and also conclude the district court was ultimately correct in vacating the state law homicide convictions. However, my approach to the question of assimilation raises the question of whether the district court should have dismissed the state law homicide charges before they even went to the jury. Again, though, I agree with the majority that we can avoid resolving that vexing question in this case. As regards Ms. Christie’s assertion that the state law homicide charges should not have gone to the jury, I agree with the majority that any error in permitting these charges to go to the jury was ultimately harmless.