(Slip Opinion)

# Application of the Assimilative Crimes Act to Conduct of Federal Employees Authorized by Federal Law

Federal employees performing their duties in a manner authorized by federal law, while on a federal enclave within a state that criminalizes such authorized conduct, would not violate the Assimilative Crimes Act and could not be prosecuted by the federal government under that law.

August 12, 2022

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum records advice we provided you on June 20, 2022. The Assimilative Crimes Act ("ACA") makes certain state criminal laws applicable on areas within federal jurisdiction known as federal enclaves. 18 U.S.C. § 13(a). You asked us to consider whether federal employees performing their duties in a manner authorized by federal law, while on a federal enclave within a state that criminalizes such authorized conduct, would violate the ACA and could be prosecuted by the federal government. We conclude that federal employees engaging in such conduct would not violate the ACA and could not be prosecuted by the federal government under that law.

## I.

The ACA applies on areas within the special maritime and territorial jurisdiction of the United States, *see* 18 U.S.C. § 13(a) (citing 18 U.S.C. § 7), which are known as federal enclaves. Federal enclaves on which the ACA applies may include post offices, federal courthouses, Department of Veterans Affairs hospitals, military installations, and national parks. Determining whether the ACA applies on a particular area requires a case-by-case analysis.

As a general rule, under the Constitution's Enclaves Clause, states may not legislate with respect to federal enclaves. U.S. Const. art. I, § 8, cl. 17; *see Paul v. United States*, 371 U.S. 245, 263, 268 (1963). Particularly in the 1820s, when the ACA was enacted, this feature of our Constitution left substantial gaps in the criminal code applicable on federal enclaves, because at the time "federal statutory law punished only a few crimes committed on federal enclaves, such as murder and manslaughter." *Lewis*

*v. United States*, 523 U.S. 155, 160 (1998). "Consequently James Buchanan, then a Congressman, could point out to his fellow House Members a 'palpable defect in our system,' namely, that 'a great variety of actions, to which a high degree of moral guilt is attached, and which are punished . . . at the common law, and by every State . . . may be committed with impunity' on federal enclaves." *Id.* (alterations in original) (quoting 40 Annals of Cong. 929 (1823)). Congressman Daniel Webster proposed a solution, "introducing a bill that both increased the number of federal crimes and also made 'the residue' criminal," *id.* at 160–61 (quoting 1 Cong. Deb. 338 (1825)), "by assimilating state law where federal statutes did not provide for the 'punishment' of an 'offence,'" *id.* at 161 (quoting Act of Mar. 3, 1825, ch. 65, § 3, 4 Stat. 115, 115). "This law, with only a few changes, has become today's ACA." *Id.* (citing *Williams v. United States*, 327 U.S. 711, 719–23 (1946)).

The ACA "use[s] local statutes to fill in gaps in the Federal Criminal Code where no action of Congress has been taken to define the missing offenses." *Williams*, 327 U.S. at 719; *see Lewis*, 523 U.S. at 160. It provides that "[w]hoever within or upon" a federal enclave

> is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State . . . in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13(a). Federal officials are responsible for prosecuting violations of the ACA.

## II.

*Lewis*, *Williams*, and most of the ACA decisions we have reviewed involve situations in which another federal criminal law punishes an act or omission that is also punishable by a state criminal law but defines the crime or the punishment differently. In such a case the statutory interpretation question is whether the ACA nonetheless assimilates the state law resulting from a purported gap in the federal criminal code. For example, in *Lewis*—the Supreme Court's most recent examination of the ACA—the federal indictment relied on the ACA to charge a violation of Louisiana's

first-degree murder statute, and the defendant argued that a specific federal offense covering her conduct precluded resort to the ACA. 523 U.S. at 158–59. The Court applied a two-step analysis, asking first whether the specific federal criminal law covered the defendant's acts and, if it did, then asking whether features of that federal law "preclude[d] application of the state law in question." *Id.* at 164. The Court held that the federal second-degree murder statute covered the defendant's acts and that the absence of the defendant's actions on the list specified in the federal first-degree murder statute "reflect[ed] a considered legislative judgment" that precluded application of the Louisiana law. *Id.* at 169; *see id.* at 169–72. Likewise, in *Williams*—which the Court in *Lewis* described as "the leading case in which" it had applied the ACA, *id.* at 164—although the defendant's actions on a federal enclave were criminal under federal laws concerning "adultery or fornication," the federal indictment charged a violation of the ACA, citing Arizona's statutory rape statute. *Williams*, 327 U.S. at 717–18. The Court held that the ACA did not assimilate the Arizona law, "both because the federal adultery and fornication statutes covered the defendant's precise acts," and because the policies underlying yet another, related federal statute "made clear there was no gap to fill." *Lewis*, 523 U.S. at 164 (internal quotation marks omitted) (describing and citing *Williams*, 327 U.S. at 724–25).

You have asked us to consider a different circumstance than the one at issue in cases such as *Williams* and *Lewis*—not a situation in which federal law apart from the ACA *criminalizes* or *forbids* the conduct in question, but one in which federal law actually *authorizes* the conduct, whether it occurs on a federal enclave or not. As in the traditional ACA cases, the ultimate question is one of congressional intent—i.e., whether Congress intended for state law to be assimilated on a federal enclave. *See Lewis*, 523 U.S. at 166. But here—where state law criminalizes conduct that federal law authorizes—the answer is more straightforward than in the typical ACA case: the federal authorization trumps, i.e., preempts, application of the state prohibition to the relevant conduct by a federal employee on the federal enclave, just as it precludes application of that state law outside the federal enclave, where the state may not prohibit what federal law authorizes (absent consent of the federal government). With respect to the conduct of federal employees, "[t]he Constitution's Supremacy Clause generally immunizes the Federal Government from state

3

laws that directly regulate . . . it," unless the federal government has consented to such state regulation. *United States v. Washington*, 142 S. Ct. 1976, 1982 (2022); *see* U.S. Const. art. VI, cl. 2. While it "very well may be" that state laws "might affect incidentally the mode of carrying out" federal "employment," there is a presumption that state law "will not be allowed to control the conduct of" a federal employee "acting under and in pursuance of the laws of the United States." *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920); *see id.* at 55 (describing the question as whether state law can "interrupt the acts of the [federal] government itself").

Courts find "that Congress has authorized state regulation that would otherwise violate the Federal Government's intergovernmental immunity 'only when and to the extent there is a clear congressional mandate.'" *Washington*, 142 S. Ct. at 1984 (quoting *Hancock v. Train*, 426 U.S. 167, 179 (1976)). It would be surprising, to say the least, to recognize such a "mandate" authorizing state laws to apply to federal employees on federal enclaves where such state laws do not apply to those employees outside such enclaves. The ACA itself is not such a mandate. It contains no language to subject, and reveals no intent to subject, the actions of a federal employee on a federal enclave to state punishment that would be precluded by other federal statutory and regulatory law outside the enclave. To the contrary, the ACA reflects a longstanding "policy" to apply state criminal law "to the extent that offenses are *not* preempted by congressional enactments." *United States v. Sharpnack*, 355 U.S. 286, 292–93 (1958) (emphasis added). Thus, if federal law authorizes the employee's actions in question, such that those actions are shielded by intergovernmental immunity from state prosecution, then application of state law is appropriately viewed as preempted.

In all such cases, those actions are also shielded from application of the ACA. There is no reason to believe that Congress would have wanted to render conduct by federal employees criminal *only* when it occurs on a federal enclave.

Our interpretation of the ACA is consistent with the Act's "gap-filling purpose." *Lewis*, 523 U.S. at 164. Where federal law authorizes a federal employee to perform an act on a federal enclave and would shield that employee from state liability if the act were performed outside the enclave, there is no "gap[] in the federal criminal law that applies on [the]

federal enclave[]" to fill. *Id.* at 160. Instead, there is a deliberate federal decision to permit (or even require) the employee to perform the relevant actions. If a federal criminal prohibition can "preclude application of [a] state law" on a federal enclave, *id.* at 164, *a fortiori* a federal authorization can as well.

The ACA's text confirms this conclusion. If a federal employee is immune from state prosecution by virtue of the Supremacy Clause, the employee's conduct is not "punishable if committed . . . within the jurisdiction of the State . . . in which" the federal enclave is "situated, by the [state] laws thereof in force at the time of such act." 18 U.S.C. § 13(a). Therefore, when the federal employee performs that act on a federal enclave, there is no applicable state criminal prohibition to assimilate.

The United States Court of Appeals for the Ninth Circuit reached this conclusion in *Blackburn v. United States*, 100 F.3d 1426 (9th Cir. 1996), which the Supreme Court cited in *Lewis*, 523 U.S. at 166. In *Blackburn*, the court held that the ACA did not assimilate a California law that would have required the National Park Service to post certain warning signs in Yosemite National Park. 100 F.3d at 1435; *see id.* at 1428. The court observed that "states may not directly regulate the Federal Government's operations or property," *id.* at 1435 (citing *Hancock*, 426 U.S. at 178–80; *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)), and concluded that assimilating the California law under the ACA would effectuate an impermissible "direct and intrusive regulation by the State of the Federal Government's operation of its property at Yosemite," *id.* Courts have reached a similar conclusion under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961–1968. As relevant in those cases, RICO applies where a defendant is, "variously, 'chargeable,' 'indictable,' or 'punishable' for violations of specific state and federal criminal provisions." Courts have explained that "it is clear that there can be no RICO claim against the federal government" because "it is self-evident that a federal agency is not subject to state or federal criminal prosecution." *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991) (quoting 18 U.S.C. § 1961(1)); *see McNeily v. United States*, 6 F.3d 343, 350 (5th Cir. 1993); *Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210, 1215 n.5 (10th Cir. 1999).

Finally, our interpretation is consistent with *Lewis*. As noted above, that case instructs that assimilation is not appropriate if application of a

state law "would interfere with the achievement of a federal policy." 523 U.S. at 164 (citing *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 389–90 (1944)); *see id.* at 165–66 (citing *Williams*, 327 U.S. at 724–25). Application of a state law to criminalize acts that federal law authorizes federal employees to undertake would create such a conflict. Granted, *Lewis* could be read to prescribe this inquiry only at the second step of the analysis it described, i.e., in cases where another federal law makes the defendant's act criminal. *See id.* at 164–65. But *Lewis* repeatedly cited cases that considered a conflict with federal policy as a reason not to assimilate state law more generally, not merely when a federal law punished the act in question. *See id.* at 164, 166, 170 (citing *Yellow Cab*, 321 U.S. at 389–90; *Williams*, 327 U.S. at 718; *Sharpnack*, 355 U.S. at 289; *Blackburn*, 100 F.3d at 1435). In *Yellow Cab*, for example, when Oklahoma was a dry state, the Court confronted the question whether the ACA assimilated Oklahoma's criminal liquor laws to apply on Fort Sill. 321 U.S. at 389–90. Without considering whether there was a federal law punishing the relevant acts, the Court wrote that one of the questions to be resolved was whether the relevant state law was "in conflict with federal policies as expressed by Acts of Congress other than the [ACA] or by valid Army Regulations which have the force of law." *Id.* at 390 (footnotes omitted); *see id.* (stating that a state law should only be assimilated if it was "not inconsistent with federal policies"); *see also id.* at 390 n.9 (suggesting but not deciding that if Army Regulations permitted liquor sales on the base, state law would be in conflict).

Likewise, in *Blackburn* the Court of Appeals for the Ninth Circuit rejected the contention that the California law at issue was assimilated simply because it had no "specific federal equivalent." 100 F.3d at 1435 (internal quotation marks omitted). In addition to the rationale described above, the court reasoned that subjecting Yosemite to the requirements of the California law "would do violence to the main purposes and objectives underlying the National Park System: visitor enjoyment and resource protection." *Id.* The court concluded that assimilating the California law would "conflict[] with federal policy" by creating "massive despoliation of the natural and riparian environment within the park." *Id.* at 1435–36. Similarly, if assimilating state law under the ACA would impede work that federal law authorizes federal employees to perform on federal enclaves, assimilation would conflict with federal policy.

The Supreme Court in *Sharpnack* nicely summarized the relationship between local criminal law and federal policy when commenting on Congress's 1948 enactment of the ACA: "Recognizing its underlying policy of 123 years' standing, Congress has thus at last provided that within each federal enclave, to the extent that offenses are not preempted by congressional enactments, there shall be complete current conformity with the criminal laws of the respective States in which the enclaves are situated." 355 U.S. at 292–93. For purposes of applying the ACA it does not matter whether the federal policy that preempts the assimilation of state law is embodied in a federal criminal statute or another congressional enactment, such as a law authorizing federal employees to perform certain acts.

\* \* \* \* \*

By virtue of the Supremacy Clause, absent the consent of the federal government, states may not criminalize federal employees' performance of their federally authorized duties. Under this well-settled principle, which applies whether the conduct occurs on or off a federal enclave, federal employees who engage in such conduct do not violate the ACA and cannot be prosecuted by the federal government under that law.

CHRISTOPHER H. SCHROEDER
*Assistant Attorney General*
*Office of Legal Counsel*
