**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

CAMERON REED,
*Defendant-Appellant*.

</td>
<td>

No. 12-10420

D.C. No.
2:11-cv-01394-
PMP-VCF-1

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, Senior District Judge, Presiding

Argued and Submitted
June 13, 2013—San Francisco, California

Filed August 22, 2013

Before: Diarmuid F. O'Scannlain and Milan D. Smith, Jr.,
Circuit Judges, and Michael M. Anello, District Judge.[*]

Opinion by Judge Anello

---

[*] The Honorable Michael M. Anello, United States District Judge for the Southern District of California, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed a conviction by conditional guilty plea to violating Nev. Rev. Stat. § 484C.110(3)(g), which prohibits driving with over 2 ng/ml of marijuana in the blood, assimilated into federal law under the Assimilative Crimes Act, 18 U.S.C. § 13, in a case in which the defendant was arrested after driving erratically on a federal road in the Lake Mead National Recreation Area.

The panel held that assimilation of Nevada's per se drugged driving law was proper because although the defendant's conduct is punishable under the federal DUI regulation (36 C.F.R. § 4.23(a)(1)), 36 C.F.R. § 4.2 manifests the National Park Service's clear intent to assimilate traffic laws such as Nevada's per se drugged driving law, there is a gap in federal law with respect to punishing operators of vehicles who exceed a per se drug limit regardless of impairment, and assimilating the Nevada law would not conflict with federal policy or effectively rewrite a federal offense definition.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Alina Maria Shell, Assistant Federal Public Defender, Las Vegas, Nevada, for Defendant-Appellant.

Adam McMeen Flake (argued), Assistant United States Attorney, and Nadia Janjua Ahmed, Special Assistant United States Attorney, Las Vegas, Nevada, for Plaintiff-Appellee.

## OPINION

ANELLO, District Judge:

Appellant Cameron Reed was arrested after driving erratically on a federal road located in the Lake Mead National Recreation Area in Nevada. Reed's blood contained 3.7 nanograms per milliliter (ng/ml) of marijuana. Reed pleaded guilty to violating Nev. Rev. Stat. § 484C.110(3)(g), which prohibits driving with over 2 ng/ml of marijuana in the blood, assimilated into federal law under the Assimilative Crimes Act ("ACA" or "the Act"), 18 U.S.C. § 13. Reed asserts that his conviction was improper because an applicable federal regulation punishes his conduct, thereby precluding assimilation of Nevada law.

We have jurisdiction pursuant to 12 U.S.C. § 1291. Because assimilation of Nevada law was proper, we affirm.

## BACKGROUND

On March 27, 2010, a National Park Service ("NPS") ranger at the Lake Mead National Recreation Area observed a vehicle traveling at a high rate of speed. The ranger paced

the vehicle at 40 miles per hour in a posted 15 miles-per-hour-zone, and watched as it turned into the exit of a one-way loop, passing two "Do Not Enter" signs. After initiating a traffic stop, the ranger identified the driver as Reed. A strong odor of burnt marijuana emanated from the vehicle, and the ranger saw an open container of "Mike's Hard Lemonade" resting in the center console. Reed's speech was slurred and he admitted to smoking one marijuana joint and taking a sip of alcohol while driving. The ranger administered four field sobriety tests; Reed failed three. Reed was arrested. Subsequently, the ranger searched Reed's vehicle and found a cigarette box containing a substance he suspected to be marijuana. Later blood tests revealed 3.7 ng/ml of Δ9-Tetrahydrocannabinol (marijuana) and 15 ng/ml THC carboxylic acid (marijuana metabolite) in Reed's system.

Reed was originally charged with four federal Class B misdemeanor offenses, including operating a motor vehicle under the influence of drugs or alcohol in violation of 36 C.F.R. § 4.23(a)(1) (Count One), unsafe operation in violation of 36 C.F.R. § 4.22(b)(1) (Count Two), possession of a controlled substance in violation of 36 C.F.R. § 2.35(b)(2) (Count Three), and open container in violation of 36 C.F.R. § 4.14(b) (Count Four). Later, via an amended complaint, Reed was further charged with operating a vehicle with an amount of marijuana in his blood in violation of Nev. Rev. Stat. § 484C.110(3)(g) (Count Five), and operating a vehicle with an amount of marijuana metabolite in his blood in violation of Nev. Rev. Stat. § 484C.110(3)(h)(1) (Count Six). The government used the ACA to assimilate the Nevada laws into federal law.

Reed moved to dismiss the state law claims, arguing that they were not properly assimilated under the ACA. After a

magistrate judge denied the motion, Reed entered conditional guilty pleas to Count Two (unsafe operation) and Count Five (driving with a proscribed amount of marijuana in his blood). The remaining claims were dismissed. Reed reserved his right to appeal the denial of his motion to dismiss Count Five, but waived his right to appeal any other aspect of his conviction. On appeal, the district court affirmed, concluding that assimilation of the Nevada law was proper.

Reed timely appealed to this Court. He asserts that his conviction was improper because a federal regulation punishes his conduct, thereby precluding assimilation of the Nevada law.[1]

## APPLICABLE LAW

## I.  The Assimilative Crimes Act – 18 U.S.C. § 13(a)

The ACA promotes the even-handed application of state law to local conduct that federal law does not punish and, but for the situs being a federal enclave, would qualify as a local offense. *United States v. Waites*, 198 F.3d 1123, 1127 (9th Cir. 2000). The Act provides:

> Whoever within or upon any [federal enclave] is guilty of any act or omission which, although not made punishable by any act of Congress, would be punishable if committed

---

[1] Reed also contests the constitutionality of Nevada's per se marijuana metabolite law, Nev. Rev. Stat. § 484.110(3)(h). We do not reach this argument, however, because the issue is moot. Count Six, which contained this charge, was dismissed as part of Reed's conditional plea. Moreover, Reed waived his right to appeal any aspect of this charge.

> or omitted within the jurisdiction of the State
> . . . in which such place is situated, . . . shall
> be guilty of a like offense and subject to like
> punishment.

18 U.S.C. § 13(a). The ACA's basic purpose is "one of borrowing state law to fill gaps in the federal criminal law that applies on federal enclaves." *Lewis v. United States*, 523 U.S. 155, 160 (1998). In so doing, the Act "establishes uniformity in a state's prohibitory laws where such conduct is not made penal by federal statutes." *United States v. Marcyes*, 557 F.2d 1361, 1364 (9th Cir. 1977). But the ACA is not intended to make federal enclaves subject to the entirety of the criminal law of the state in which the enclave is located. Instead, it makes applicable only those state criminal laws that make punishable acts or omissions that have not been made punishable "by any enactment of Congress." 18 U.S.C. § 13(a).

In *Lewis v. United States*, 523 U.S. 155 (1998), the Supreme Court established a two-part test for analyzing whether a particular state criminal law is properly incorporated into federal law under the Act. First, a court must inquire whether the "defendant's 'act or omission . . . [is] made punishable by any enactment of Congress.'" *Lewis*, 523 U.S. at 164 (quoting 18 U.S.C. § 13(a)). "If the answer to this question is 'no,' that will normally end the matter. The ACA presumably would assimilate the statute." *Id.* But if the act or omission in question is punishable by some federal enactment, a court must ask a second question: "Does applicable federal law indicate an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue?" *Id.* at 166.

## II. Title 36 of the Code of Federal Regulations

Title 36 of the Code of Federal Regulations "provide[s] for the proper use, management, government, and protection of persons, property, and natural and cultural resources within areas under the jurisdiction of the National Park Service." 36 C.F.R. § 1.1(a). Part 4 of Title 36 ("Part 4") regulates vehicles and traffic safety within park areas. *See* 36 C.F.R. §§ 4.1–4.31. Because the Lake Mead National Recreation Area is federally owned land operated by the NPS, all drivers within the park, Reed included, are subject to the traffic regulations set forth in Part 4.

"[T]he foundation of [Part 4's] vehicle and traffic safety regulations [is] the nonconflicting provisions of the respective State vehicle codes, which are adopted in § 4.2." Vehicles and Traffic Safety, 52 Fed. Reg. 10670-01, 10670 (Apr. 2, 1987). Section 4.2 provides:

> (a) Unless specifically addressed by regulations in this chapter, traffic and the use of vehicles within a park area are governed by State law. State law that is now or may later be in effect is adopted and made a part of the regulations in this part.

> (b) Violating a provision of State law is prohibited.

36 C.F.R. § 4.2. In its final rule commentary, the NPS expounded on § 4.2 by stating:

> [Section 4.2], which applies regardless of the type of jurisdiction exercised by the NPS,

adopts State vehicle codes as the basis for the regulation and control of traffic in park areas. The NPS is adopting, as if they were a part of the regulations in Part 4, all the applicable and nonconflicting vehicle and traffic laws of the State and local political subdivision(s) within whose exterior boundaries a park area or a portion thereof is located.

Vehicles and Traffic Safety, 52 Fed. Reg. 10670-01, 10678 (Apr. 2, 1987).

36 C.F.R. § 4.23 addresses driving while under the influence of alcohol or drugs. Specifically, § 4.23(a)(1) (the "federal DUI regulation") prohibits "[o]perating or being in actual physical control of a motor vehicle" when the operator is "[u]nder the influence of alcohol, or a drug, or drugs, or any combination thereof, to a degree that renders the operator incapable of safe operation." 36 C.F.R. § 4.23(a)(1). Section 4.23(a)(2) (the "per se drunk driving regulation") prohibits operating a motor vehicle when "[t]he alcohol concentration in the operator's blood or breath is 0.08 grams or more of alcohol per 100 milliliters of blood or 0.08 grams or more of alcohol per 210 liters of breath." 36 C.F.R. § 4.23(a)(2).

Of particular significance to our discussion here, while the federal DUI regulation prohibits operating a vehicle while under the influence of alcohol *or* drugs to a degree that renders the operator incapable of safe operation, the subsequent per se drunk driving regulation codifies only a per se *alcohol* provision, and does not include a corresponding per se *drug* provision. In its initial and final rule announcements of § 4.23(a), the NPS clarified that these two

regulations were separate and distinct offenses, rather than alternative methods of establishing impairment:

> Paragraph (a) of this regulation addresses two individual offenses. The first is a standard prohibition against operating a motor vehicle while under the influence of alcohol or drugs . . . . The second offense involves operating a vehicle while the alcohol concentration in the operator's blood is 0.10 grams or more of alcohol per 100 milliliters of blood or 0.10 grams or more of alcohol per 210 liters of breath.

Vehicles and Traffic Safety (Final Rule), 52 Fed. Reg. 10670-01, 10680 (Apr. 2, 1987); Vehicles and Traffic Safety (Proposed Rule), 51 Fed. Reg. 21840-01, 21843 (June 16, 1986).

### III.    Nevada Revised Statutes § 484C.110

Similar to the federal regulations, Nevada law includes an "under the influence" of drugs or alcohol law in addition to a per se drunk driving provision. *See* Nev. Rev. Stat. § 484C.110(1)–(2). Proceeding one step further, Nevada law promulgates a per se drugged driving provision, which provides in relevant part that:

> It is unlawful for any person to drive or be in actual physical control of a vehicle on a highway or on premises to which the public has access with an amount of a prohibited substance in his or her blood or urine that is

> equal to or greater than: . . . [2 nanograms of
> marijuana per milliliter of blood.]

Nev. Rev. Stat. § 484C.110(3)(g) ("Nevada's per se drugged
driving law"). Because there is no federal equivalent to
Nevada's per se drugged driving law, the government utilized
the ACA to assimilate the Nevada statute into federal law in
the amended complaint filed against Reed. Reed's appeal
questions whether assimilation of Nevada's per se drugged
driving law was proper.

## DISCUSSION

We review *de novo* whether the ACA assimilates a state
law crime. *See United States v. Souza*, 392 F.3d 1050, 1052
(9th Cir. 2004).

## I. *Lewis* - Step One

*Lewis* instructs us to first question whether Reed's
conduct is made punishable by "any enactment of Congress."
*Lewis*, 523 U.S. at 164. An "enactment of Congress," for
purposes of the ACA, encompasses federal regulations as
well as statutes. *See United States v. Waites*, 198 F.3d 1123,
1128 (9th Cir. 2000). The parties agree that the federal DUI
regulation, 36 C.F.R. § 4.23(a)(1), is the lone federal
enactment which could punish Reed's behavior of driving
while impaired. As mentioned, this regulation prohibits
"[o]perating or being in actual physical control of a motor
vehicle" when the operator is "[u]nder the influence of
alcohol, or a drug, or drugs, or any combination thereof, to a
degree that renders the operator incapable of safe operation."
36 C.F.R. § 4.23(a)(1).

When considering *Lewis*'s first prong, the district court compared Reed's conduct to the federal DUI regulation, and determined that the regulation punished his conduct. Specifically, the district court found:

> Reed drove 40 miles per hour in a 15 miles per hour zone, entered the exit of a one-way loop, and passed two "Do Not Enter" signs. Reed had slurred speech and failed three Field Sobriety Tests. Reed admitted taking a sip of alcohol and smoking marijuana before driving. When [the park ranger] searched Reed's vehicle, he found an open container of "Mike[']s Hard Lemonade" and 1.33 grams of marijuana. Reed's blood contained 3.7 ng/ml of marijuana. The [federal DUI regulation] punishes this conduct. Indeed, Count One of the Amended Complaint charged Reed with violating the [federal DUI regulation] for this very conduct.

*United States v. Reed*, 878 F. Supp. 2d 1199, 1205 (D. Nev. 2012).

We agree with the district court and conclude that Reed's conduct is punishable under the federal DUI regulation. Reed operated a motor vehicle in an unsafe manner while under the influence of drugs. This conduct is directly punishable by § 4.23(a)(1).[2] We thus proceed to the second prong of *Lewis*.

---

[2] The government argues that the precise conduct in question is *not* punishable by the federal DUI regulation, thereby concluding the ACA analysis at *Lewis*'s first prong. *See Lewis*, 523 U.S. at 164. The government reaches this result by noting that the elements of Nevada's per

## II. *Lewis* - Step Two

Once we conclude that a federal enactment punishes the defendant's conduct, we are instructed to consider whether the applicable federal law "preclude[s] application of the state law in question." *Lewis*, 523 U.S. at 164. In this regard, "[t]he primary question . . . is one of legislative intent: Does applicable federal law indicate an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue?" *Id.* at 166. Properly framed, we inquire: Does the NPS indicate an intent to punish Reed's behavior with the federal DUI regulation *to the exclusion* of Nevada's per se drugged driving law?

There is no "automatic general answer to this second question." *Id.* at 165. However, a state statute will not be assimilated if, for example, (1) its application would conflict with federal policy; (2) it would effectively rewrite an offense definition that Congress carefully considered; or (3) the federal statutes reveal an intent to occupy so much of a field

---

se drugged driving law differ from the elements of the federal DUI regulation. While this observation is correct, it is not dispositive of the issue. On the contrary, the elements of the subject laws are largely irrelevant at *Lewis*'s first prong. When faced with a similar argument, *Lewis* unequivocally clarified that the "precise acts" test–"which comes close to a 'precise elements' test"–would "produce an ACA that is too broad[,]" "assimilat[ing] state law even where there is no gap to fill." *Id.* at 163–64.

Furthermore, under the government's approach, the question of whether "the *defendant's act or omission*" is "made punishable by any enactment of Congress" could be answered without any consideration of the defendant's acts or omissions. This curious approach is not sanctioned by *Lewis*, which clearly directs that the focus be on the "defendant's acts or omissions." *Id.* at 168 (quoting 18 U.S.C. § 13(a)).

as to exclude use of the particular state statute. *Id.* at 164 (citations omitted).

"It seems fairly obvious that the Act will not apply where both state and federal statutes seek to punish approximately the same wrongful behavior–where, for example, differences among elements of the crimes reflect jurisdictional, or other technical, considerations, or where differences amount only to those of name, definitional language, or punishment." *Id.* at 165. Conversely, "a substantial difference in the kind of wrongful behavior covered (on the one hand by the state statute, on the other, by federal enactments) will ordinarily indicate a gap for a state statute to fill–unless Congress through the comprehensiveness of its regulation, or through language revealing a conflicting policy, indicates to the contrary in a particular case." *Id.* at 165–66 (citations omitted). "The ultimate issue is whether there is a gap in federal law that may be filled by [Nevada's per se drugged driving law]." *Souza*, 392 F.3d at 1054 (citing *Lewis*, 523 U.S. at 160). We answer "yes," for several reasons.

First, the NPS's intent with respect to gap filling is clearly manifested in § 4.2, which automatically invites assimilation of all nonconflicting state traffic laws. Second, the subject laws do not seek to punish approximately the same wrongful behavior. While there is some overlap between the conduct proscribed by the subject laws, the generalized federal DUI regulation does not punish the specific conduct of driving with a certain level of drugs in one's blood. Third, assimilating Nevada's per se drugged driving law would not conflict with federal policy or effectively rewrite an offense definition that the NPS carefully considered, nor does Part 4 of Title 36 of the Code of Federal Regulations reveal an

intent to occupy so much of a field as to preclude assimilation of the per se drugged driving law.

### A. Section 4.2 Manifests the NPS's Clear Intent to Assimilate State Traffic Laws Such As Nevada's Per Se Drugged Driving Law.

As legislative intent is "primary" to resolution of *Lewis*'s second step, we begin there. *See Lewis*, 523 U.S. at 166. Part 4 of Title 36 of the Code of Federal Regulations presents a unique statutory framework with respect to gap filling. Under § 4.2, the federal traffic regulations explicitly incorporate all state vehicle and traffic laws, "[u]nless specifically addressed" by the federal regulations. 36 C.F.R. § 4.2. As the legislative history states, "[t]he NPS *intends* that the foundation of its vehicle and traffic safety regulations be the nonconflicting provisions of the respective State vehicle codes, which are adopted in § 4.2." 52 Fed. Reg. 10670-01, 10670 (Apr. 2, 1987) (emphasis added). Accordingly, "[t]he NPS is adopting, as if they were a part of the regulations in Part 4, all the applicable and nonconflicting vehicle and traffic laws of the State . . . within whose exterior boundaries a park area . . . is located." *Id.* at 10678.[3]

The NPS's intent could not be clearer: all nonconflicting state traffic laws apply on federal enclaves. In lieu of

---

[3] A review of caselaw demonstrates that § 4.2 is generally a standalone vehicle through which the United States assimilates state traffic laws into federal law. In these cases, the ACA is generally not even invoked. *See, e.g.*, *United States v. Bibbins*, 637 F.3d 1087, 1088 (9th Cir. 2011) (incorporating Nev. Rev. Stat. § 482.275, obstructing a license plate, directly under § 4.2); *United States v. Bohn*, 622 F.3d 1129, 1133 (9th Cir. 2010) (incorporating a Washington law prohibiting driving a motorcycle without wearing a helmet under § 4.2).

promulgating dozens, if not hundreds, of traffic laws, the NPS was satisfied to issue but a handful, leaving nonconflicting state law to fill the gaps. We thus proceed to consider whether Nevada's per se drugged driving law is "specifically addressed" by—such that it "conflicts" with—Part 4's regulations.

As detailed above, Part 4 does not codify a per se drugged driving regulation, nor does it otherwise "specifically address" such a provision. Consequently, a plain reading of Part 4 demands a finding that Nevada's per se drugged driving law does not conflict with Part 4's regulations.

Reed argues that the absence of a per se drugged driving regulation indicates the NPS's deliberate intent to *preclude* federal prosecutions of operators who drive with per se levels of drugs in their system. Reed presumes this intent by invoking the principle of statutory construction—known as the *Russello* presumption—that where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). In this case, while Part 4's federal DUI regulation addresses drugs, the accompanying per se regulation does not.

We find the *Russello* presumption unpersuasive in this context. First, because the NPS's intent is clear, we need not attempt to infer it via the *Russello* presumption. As discussed previously, the NPS clearly understands that there are gaps in its regulations and clearly incorporates all state vehicle and traffic laws to fill those gaps. Applying the *Russello* presumption would eviscerate the basic structure of Part 4.

Second, there is strong evidence to support a finding that the NPS did not even consider adopting a per se drugged driving offense, thereby rebutting the *Russello* presumption.[4] Indeed, Part 4's legislative history makes no mention of a proposed, yet rejected, per se drugged driving regulation. This omission is unsurprising considering that not a single state had enacted a per se drugged driving law when Part 4 was adopted in 1987.

To ready our historical lens, we ask the following: What was the NPS's intent in adopting an "under the influence" of alcohol *or* drugs regulation, and a per se drunk driving regulation, but not a per se drugged driving regulation? The historical progression of "under the influence" and per se drunk driving laws versus per se drugged driving laws provides a logical explanation.

By 1966, nearly all states prohibited motorists from driving a motor vehicle while *under the influence* of drugs or alcohol.[5] Similarly, per se drunk driving laws have been on the books since the 1960s. "In the late 1960s and early 1970s, States began adopting per se laws that defined the

---

[4] The Supreme Court has held that the *expressio unius est exclusio alterius* statutory principle does not apply "unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1175 (2013) (quotations and citations omitted). The *expressio unius* canon creates a presumption that "when a statute designates certain persons, things, or manners or operation, all omissions should be understood as exclusions." *United States v. Fuller*, 531 F.3d 1020, 1027 (9th Cir. 2008). This canon is directly related to the *Russello* principle, and courts at times use them interchangeably. *See id.*

[5] *See* Tina Wescott Cafaro, *Slipping Through The Cracks: Why Can't We Stop Drugged Driving?*, 32 W. New Eng. L. Rev. 33, 41 (2010).

offense in terms of the BAC level."[6]  In the 1980s alone, "[a]bout 1200 anti-drunk driving laws were passed as a result of political pressure . . . ."[7]

However, in 1987, the year Part 4 was adopted, no State had a per se drugged driving law.[8]  "Drug per se laws, analogous to illegal per se laws for alcohol, are a relatively new phenomenon in the United States.  Arizona was the first State to adopt a drug per se law, in 1990 . . . ."[9]

With this historical backdrop, it becomes clear why the NPS would adopt an "under the influence" of alcohol *or* drugs regulation, and a per se drunk driving regulation, but not a per se drugged driving regulation.  "Under the influence" statutes were commonplace and the national conversation regarding per se drunk driving laws was loud, but the discussion involving per se drugged driving laws was not yet ripe.[10]  For these reasons, we are satisfied that the

---

[6] U.S. Dep't of Transp., *Drug Per Se Laws: A Review of Their Use in States* 4 (2010) [hereinafter *Drug Per Se Laws*], *available at* www.nhtsa.gov/staticfiles/nti/impaired_driving/pdf/811317.pdf.

[7] John Hoffman, *Implied Consent With A Twist: Adding Blood to New Jersey's Implied Consent Law and Criminalizing Refusal Where Drinking and Driving Results in Death or Serious Injury*, 35 Rutgers L.J. 345, 345 n.1 (2003) (citing Alan Cavaiola & Charles Wuth, *Assessment and Treatment of the DWI Offender* 24 (2002)).

[8] *See Drug Per Se Laws*, *supra* note 6, at 6 and Table 1.

[9] *Id.* at 6.

[10] In addition, the task of enumerating a per se drugged driving regulation absent guidance from any existing state law would be difficult, to say the least.  It is fairly simple to promulgate an "under the influence"

*Russello* presumption is not applicable here. What remains is the NPS's codified intent for all nonconflicting state traffic laws, whether currently in effect or later placed into effect, to apply on federal enclaves.

**B. The Subject Laws Do Not Punish Approximately the Same Wrongful Behavior Because the Federal Regulations Do Not Punish the Specific Conduct of Driving with a Certain Level of Drugs in One's Blood**.

We next consider whether the subject laws seek to punish approximately the same wrongful behavior. *Lewis* advises that this can occur where "differences among elements of the crimes reflect jurisdictional, or other technical, considerations, or where differences amount only to those of name, definitional language, or punishment." *Lewis*,

---

regulation. Adopting a per se regulation is another matter entirely. Even a brief glance at Nevada's per se drugged driving law (Nev. Rev. Stat. § 484C.110(3)) demonstrates the highly technical nature of this endeavor. Nevada's statute lists out 11 prohibited substances and specifies the unique threshold level for each in terms of nanograms per milliliter in both urine and blood. Researching these substances and deciphering the threshold level for each undoubtedly required much effort. In light of this arduous task, it stands to reason that the NPS would pass on being the first entity to formulate such a regulation. Instead, as would appear to be its intent, the NPS was satisfied to allow any later-adopted state laws to fill this gap. *See* 36 C.F.R. § 4.2. The Supreme Court has recognized that Congress enacted the ACA to respond to federal courts' inability to declare crimes—as state courts could—according to the "general common-law." *United States v. Press Publ'g Co.*, 219 U.S. 1, 12 (1911); *see Williams v. United States*, 327 U.S. 711, 720 n.19 (1946); *Lewis*, 523 U.S. at 160. Though today's decision responds to Nevada's legislative, rather than judicial declaration, it is consistent with the idea that Congress enacted the ACA to permit "local statutes to fill in gaps in the Federal Criminal Code where no action of Congress has been taken to define the missing offenses." *Williams*, 327 U.S. at 719.

523 U.S. at 165 (citing *United States v. Adams*, 502 F. Supp. 21 (S.D. Fla. 1980)).   A review of *Adams* assists in crystallizing this rule.

In *Adams*, the defendant was apprehended for carrying a concealed revolver into a federal courthouse.   He was charged, pursuant to the ACA, under a Florida statute making it a felony to carry a concealed firearm.   He challenged his indictment under the ACA because a federal regulation specifically made it a misdemeanor to carry a concealed weapon onto federal property.   The district court found that "[t]he act prohibited under both the Florida statute and the federal regulation is the carrying of a concealed weapon. There can be no doubt that this is the 'precise act' which both laws prohibit."   *Adams*, 502 F. Supp. at 24.   It was "immaterial" that a violation of the federal regulation constituted a misdemeanor while a violation of the Florida statute was a felony. *Id.* at 25. Because the federal regulation covered the "specific act" involved, the court refused to assimilate the Florida statute. *Id.*

Here, Reed argues that Nevada's per se drugged driving law and the federal DUI regulation are not distinct offenses but rather two different modes of proving the same crime. He posits that the Nevada law simply makes it easier for the prosecution to prove its case.

We disagree.   While there is undoubtedly some overlap in the type of behavior punished by the subject laws, the differences are not trivial and relate to the specific conduct proscribed, unlike in *Adams*.   The federal DUI regulation punishes driving unsafely *because of impairment*.   Nevada's per se drugged driving law punishes driving after ingesting a specific amount of drugs, *regardless of impairment*.   This

distinction makes all the difference. The federal DUI regulation, standing alone, cannot punish drivers who manage to drive safely even after consuming an excessive amount of marijuana. Conversely, Nevada's per se drugged driving law, standing alone, cannot punish drivers who drive unsafely even if impaired, so long as they have consumed only trace amounts of marijuana. Only together do these laws punish both those who drive unsafely because of impairment and those who drive "safely" even while daring to test the limits of their cognitive and kinesthetic abilities. Accordingly, since these laws govern, and thereby seek to regulate, different behaviors, it cannot be said that per se laws exist simply to make prosecuting impaired drivers an easier endeavor.

This Court's ruling in *United States v. Souza*, 392 F.3d 1050 (9th Cir. 2004), is instructive. There, the defendant forcefully entered and removed two bags from a vehicle parked in Hawaii Volcanoes National Park and was charged under the ACA, assimilating Haw. Rev. Stat. § 708-836.5, which punishes unauthorized entry into a motor vehicle with the intent to commit a crime against a person. *Souza*, 392 F.3d at 1052. The Court found that several federal breaking-and-entering statutes "squarely" covered the defendant's conduct. *Id.* at 1053. Nonetheless, we determined that "a gap remains, because there is no applicable federal provision that punishes specifically the unauthorized entry into a motor vehicle . . . ." *Id.* at 1054. "Mere general prohibitions against tampering, vandalism, trespassing, and theft do not rise to the *level of manifesting a federal policy against assimilating a statute that punishes the specific conduct of unauthorized entry into a motor vehicle*." *Id.* (emphasis added). Because a gap existed, and because "[t]here [was] no indication of an overriding federal policy

with which the [Hawaii] statue interfere[d]," the Hawaii statute was properly assimilated. *See id.* at 1054–55.

Similarly here, Nevada's per se drugged driving law properly fills a gap in federal law by punishing the specific conduct of driving with a certain level of drugs in the blood. Further, the mere presence of the federal DUI regulation does not manifest a federal policy against assimilating Nevada's per se drugged driving law, particularly in light of the NPS's clear intent to assimilate all nonconflicting laws as well as the inclusion of the per se drunk driving regulation.

Along these same lines, the NPS's adoption of the per se drunk driving regulation further belies Reed's argument that the federal DUI regulation covers the same wrongful conduct. As discussed previously, the NPS expressly clarified, when promulgating § 4.23(a), that it considered the DUI regulation and the per se drunk driving regulation to be "two individual offenses," not alternative methods of establishing impairment. *See* 52 Fed. Reg. 10670-01, 10680 (Apr. 2, 1987). This suggests that the NPS would find more than "mere jurisdictional, technical, or definitional differences between the statutes." *Souza*, 392 F.3d at 1053. Likewise, it follows that the NPS would deem Nevada's per se drugged driving law separate and distinct from the federal DUI regulation.

These differences "in the kind of wrongful behavior covered (on the one hand by the state statute, on the other, by federal enactments) will ordinarily indicate a gap for a state statute to fill–unless [the NPS] . . . indicates to the contrary in a particular case." *Lewis*, 523 U.S. at 165–66 (citations omitted). As set forth previously, while the NPS has not indicated any intent to preclude prosecution of drivers who

violate a state's per se drugged driving law, it has *specifically codified* its intent to incorporate all nonconflicting state traffic laws into Part 4 of Title 36 of the Code of Federal Regulations. Thus, by all accounts, assimilation of Nevada's per se drugged driving law is proper.

Finally, Reed argues that the subject laws seek to punish approximately the same wrongful conduct because they seek to curtail the same social harm, i.e., the public safety concerns raised by impaired drivers. This argument is not persuasive. Neither *Lewis*, nor any known ACA authority, requires a court to compare the social harms addressed when considering whether the subject laws punish the same conduct.[11] Such a requirement would severely limit the ACA because many laws, whether directly or indirectly, attempt to

---

[11] The word "harm" appears only once in *Lewis* outside of direct quotations of state and federal murder statutes. The sole reference comes within the Court's discussion of the proper interpretation of the ACA's "any enactment" language. The Court notes,

> a literal interpretation of the words "any enactment" would leave federal criminal enclave law subject to gaps of the very kind the Act was designed to fill. The Act would be unable to assimilate even a highly specific state law aimed directly at a serious, narrowly defined evil, if the language of *any* federal statute, however broad and however clearly aimed at a different kind of *harm*, were to cover the defendant's act. Were there only a state, and no federal, law against murder, for example, a federal prohibition of assault could prevent the state statute from filling the obvious resulting gap.

*Lewis*, 523 U.S. at 161 (italics in original; underline added). Clearly, *Lewis*'s consideration of "harm" cannot be stretched to subsume the line of reasoning offered by Reed here.

curtail the same social harm.  For example, speed limits and distracted driving laws seek to address the harm of vehicle collisions.  But it cannot reasonably be said that the presence of one in the federal regulations would prevent assimilation of the other.  In sum, the social harm sought to be addressed plays no substantial role in determining whether two laws govern separate behavior.  In no helpful way does the harm addressed indicate the conduct proscribed.

## III.    The Remaining *Lewis* Considerations Favor Assimilation

As mentioned, *Lewis* provides that a state statute will not be assimilated if, for example, (1) application of the state statute would conflict with federal policy; (2) application of the statute would effectively rewrite an offense definition that Congress carefully considered; or (3) the federal statutes reveal an intent to occupy so much of a field as to exclude use of the particular state statute. *Lewis*, 523 U.S. at 164.  Much of the preceding analysis directly touches on these examples, but it bears specific mention that (1) Reed cites no federal policy with which Nevada's per se drugged driving law could conflict; (2) it is uncontested that assimilating Nevada's per se drugged driving law would not effectively rewrite an offense definition that the NPS carefully considered; and (3) the NPS has not indicated an intent to occupy the entire field of driving with a certain level of drugs in the blood.  To the contrary, as set forth above, the NPS intentionally left gaps in Part 4 to be filled by nonconflicting state law.

In sum, because there is no indication of an overriding federal policy with which Nevada's per se drugged driving law interferes, *see Souza*, 392 F.3d at 1054–55, and because there is a gap in federal law with respect to punishing

operators of vehicles who exceed a per se drug limit regardless of impairment, *see id.* (citing *Lewis*, 523 U.S. at 160), we agree with the district court that there is a gap in federal law which may be properly filled by Nevada's per se drugged driving law.

**AFFIRMED.**